Welcome B. Price et al., Plaintiffs, *v.* William H. Tompkins et al., as Executors, etc., Defendants.

(Supreme Court, Monroe Special Term, July, 1919.)

Marriage — when legal and binding — fraud — evidence — husband and wife.

About a month after his ceremonial marriage in 1848 at Lyons, N. Y., to a girl not quite fourteen and one-half years of age, who had theretofore resided with her parents in the state of New York, the husband left her and went to California and she returned to her parents who cared for her until she became

Supreme Court, July, 1919.    [Vol. 108.

of age.  On the return of her husband from California, after a short stay, he wrote asking her to return and live with him, but her father refused to permit her so to do.  In reply to a letter to the postmaster at Lyons, N. Y., concerning her husband's whereabouts she received a letter stating that he was dead.  Seventeen years after her husband left her she went to the city of New York and was thereafter known only by her maiden name.  While in the city of New York she married a widower who had two infant children by his first wife, and the second wife bore him two children and they all lived together as a happy family until her stepchildren became of age and until the death of her husband in 1886, by the terms of whose will she was given one-half of his entire estate and was one of the executors, the remaining half being given to his children in equal shares.  One of the children of the second marriage died in infancy and the other, though he survived his father, died unmarried leaving no issue, and his estate, largely derived from his father, by his will passed to his mother, who died in 1917.  In an action by her stepchildren, who had never heard of her former marriage until after her death, to recover from her estate the moneys and property which came to her from their father, both by gift in his lifetime and by his will, and through her deceased son, which action was brought upon the theory that decedent's marriage with the father of plaintiffs was illegal and void, *held,* upon consideration of the evidence, that said marriage was legal and binding; that no fraud, deceit or concealment by the wife of her former marriage had been shown.

Conceding that actual and intentional deception was practiced by the second wife for the purpose of obtaining the marriage with the plaintiffs' father and continuing its benefits, it would not have been annulled therefor at his instance had he known of it.

Certain presumptions in favor of the second marriage, which plaintiffs were bound to rebut as part of their affirmative case, pointed out and held not to have been rebutted by the testimony.

MOTION to amend complaint.

Salisbury & Agate, for plaintiffs.

Averill & Tompkins, for defendants.

SAWYER, J. Plaintiffs' motion to amend the complaint by adding immediately after the phrase " and that during such cohabitation, and until his death, the said Charles D. Price was ignorant of the marriage of the said Harriet E. Hilton and that his said marriage to her was illegal and void," the paragraph, " That in or about the year 1867, the said Harriet E. Hilton saw the said H. Seymour Hilton in the city of New York, N. Y., and ever thereafter withheld and concealed such fact from the said Charles D. Price," is granted with the usual exception to defendants. Order to that effect may be entered.

The action is brought to recover for the plaintiffs almost the entire estate with its accumulations of their father, Charles D. Price, deceased for more than a third of a century, and involves transactions the participants of which are all dead and the memory of which has almost faded from the minds of men. It may not therefore be amiss to set forth somewhat in detail the facts which have led to this most unusual controversy.

On the 12th day of March, 1848, a marriage was solemnized at Lyons, N. Y., between H. Seymour Hilton and one Harriet Mitchell, then not quite fourteen and one-half years of age, and who had theretofore resided with her parents at Geneva, N. Y. After about one month of married life the husband, apparently succumbing to the " gold excitement " then prevailing left his bride and sought for fortune in the, at that time, distant territory of California. His wife returned to her father and mother who seem thereafter to have cared for her until her maturity. Among the friends and close acquaintances of her childhood she still was known by the familiar name of Hattie while among those of less intimacy she was referred and spoken to by both her maiden name of

Supreme Court, July, 1919.     [Vol. 108.

Mitchell and her name through marriage of Hilton. This continued until after her removal to New York some seventeen years later when seemingly she dropped the name of Hilton entirely and was thereafter known only as Miss Mitchell.

Mr. Hilton's stay in California was of comparatively short duration, and upon his return he wrote his wife asking her to return and live with him. This letter was presumably written from Lyons, although there is uncertainty as to this, that village not being his family home. At any rate her father refused to permit Mrs. Hilton to return to her husband for the reason, as stated, that he had left her once and might do so again. When it is remembered that the young wife was then not far from fifteen years old this decision of the father is easily understood. Later, Mrs. Hilton wrote to the postmaster at Lyons concerning her husband's whereabouts and in reply received a letter saying that Mr. Hilton had died, and from some disease of the head. The date of this correspondence is not definitely known but from the testimony of Mrs. Bloomer as to her own age at the time, I conclude that it must have been at the outside within two or three years after the letter from Mr. Hilton asking his wife to join him.

In any event he, after such request and its refusal, appears to have dropped out of her life and unless a certain declaration referred to later on is accepted as fact, there is nothing to show that she ever saw or heard from him again, nor of him other than this notice of his death. Following the separation from Mr. Hilton she continued in her father's home for many years during which time she took up and followed the business of a local dressmaker. In the fall of 1865 she removed to New York where she obtained employment as forewoman in a dressmaking estab-

lishment and resided in the family of a married sister living in that city. Here she met one Charles D. Price, whom she married in that city on July 12, 1866. As already stated, she had after her removal to New York ceased to use the name of Hilton and was there known by her friends and acquaintances as Hattie Mitchell, under which maiden name she was married to Mr. Price.

This was Mr. Price's second marriage, and he had by his first marriage two children, these plaintiffs, then about twelve and four years of age respectively. During this marriage she bore to Mr. Price two children, one of whom died in early infancy, and the other a son named Ernest Irving Price, born about 1872, who survived his father and lived until December 11, 1911.

From the time of their marriage until Mr. Price's death, which occurred January 26, 1886, she and Mr. Price, these plaintiffs until their maturity, and her children by him while in life lived as one family, the relations seemingly having been those of a normal and happy household. Mr. Price's affection for the woman he had married, contentment with the home she made for his children and himself, and reliance upon her good sense and honesty of purpose is made manifest by his gifts to her during his lifetime of both real and personal property of much value, and by his provision for her in his will which gave her one-half of his entire estate, she being also named as one of the executors thereof. The remaining one-half was given to his children in equal shares. Their friendly marital relation is likewise shown by his visits to her family and relatives at and near the home of her childhood, which, beginning with their wedding trip in 1866, were repeated yearly until his death.

It is inconceivable that he would have continued

these annual trips, with their attendant expense and trouble, except his relations with her family and herself were harmonious. Her son Ernest Irving Price died unmarried and without children, and his estate, which was largely derived from his father, the said Charles D. Price, by his will, passed to her.

Mrs. Price died January 27, 1917, aged eighty-three years and upwards, leaving a last will and testament of which these defendants are the duly qualified executors.

Plaintiffs, her stepchildren, bring this action to set aside certain decrees of the surrogate of New York county and to recover from her estate the moneys and property which came to her from their father, both by gift, by his will, and through her deceased son Ernest Irving Price.

The action is founded upon the proposition that because of her former marriage the ceremony between Hattie Mitchell and Charles D. Price was a useless formality and that she was never in truth the wife of Mr. Price. That she induced him to marry her by the false and fraudulent representation that she was unmarried, and both then and ever thereafter concealed from him the facts of her previous status so that he should continue to believe their relations were those of lawful wedlock; that so successful was she in this that he lived and died believing her to be his wife and that the fruit of their union was honestly begotten. That his gifts to her and her child, *inter vivos* as well as by will, were procured to be made by such fraudulent acts and concealments and were made solely because of his belief that she was his legal wife and her son his legitimate heir.

Plaintiffs' cause of action must rest upon the proposition that this marriage with their father was wholly illegal and void. If otherwise valid and effectual.

mere concealment by the woman of the fact of her former marriage would not operate to destroy its force. *Fisk* v. *Fisk,* 6 App. Div. 432.

Neither would her active effort to deceive and false representations to that end serve to invalidate it. As was said by Mr. Justice Woodward: " The degree of fraud sufficient to vitiate an ordinary contract may not suffice for the annulment of a marriage; that it is not enough that the party relied upon the false representations and was deceived, or that important facts were concealed, with intent to deceive, * * * the marriage relation is a status controlled and regulated by considerations of public policy which are paramount to the rights of the parties." *Di Lorenzo* v. *Di Lorenzo,* 71 App. Div. 509–519.

If it be conceded that actual and intentional deception was practiced for the purpose of obtaining the marriage and continuing its benefits, it still remains, within the authorities quoted, that it would not have been annulled therefor at the instance of Mr. Price had he learned of the fact. It is difficult to understand upon what theory those claiming under him can assert a right in that respect not given to him, and no authority therefor has come to my attention. If, however, their right to attack the marriage upon the grounds of her fraudulent concealment of her early misfortune is superior to any possessed by him, it remains to be said that such allegations of fraud rest upon a very slight foundation. Nothing in support of them is shown other than that while living in New York immediately prior to her marriage the prospective bride was known as Miss Mitchell, was called so by Mr. Price and was described by the clergyman who married them under that name. That Mr. Price continued to live with her for upwards of twenty years,

and that until after her death in 1917 these plaintiffs never heard of her former marriage.

The clergyman's certificate is of little value. So far as appears Mrs. Price never saw it, and whether he obtained his information from her, from Mr. Price, from others, or took it for granted from hearing her so addressed, is not and cannot be known. All evidence upon the subject is lost in the silence of the grave, and such a statement not signed by and unconnected with her cannot impeach her marriage. It is significant, however, that the certificate not only omits the names, etc., of her father and mother, but incorrectly states her age, indicating that she did not furnish the information upon which the certificate is based, unless it be assumed that she deliberately falsified it, an assumption for which there is no proof and for which no reason appears. Again, she may have been entitled lawfully to resume the use of her maiden name, in which event no fraud could possibly be predicated thereon. The marriage to Mr. Hilton may have been discovered to have been, for some reason, not valid, or in the nearly twenty years that had elapsed it may have been dissolved by the courts either at her instance or that of her parents. The burden of establishing fraud is upon plaintiffs, and in a case of this character, where the use of her maiden name is relied upon as fraudulent, such use must be shown by them to have been unauthorized. No attempt to do this has been made, plaintiffs resting evidently in the belief that there is a presumption that its use was without authority. But such a presumption does not exist; the presumptions to be drawn are all in favor of the validity of her acts leading to the marriage. Where two interpretations thereof may be equally had, that consonant with innocence is always to be adopted.

That Mr. Price was in ignorance of her history

seems improbable, and at any rate is not shown. He was a prosperous city man, thirty-nine years of age, had been married before, apparently possessed of good intelligence and undoubtedly of a reasonable amount of worldly information. The passions of youth must have given place to the cautions of middle age and experience. It is not likely that such a man would have taken into his home to care for himself and his motherless children any woman until by investigation he had satisfied himself as to her character and antecedents.

That complete confidence existed between them is demonstrated by her taking him at once after her marriage to the home of her youth — to her parents, relatives, friends and neighbors, all of whom knew of her prior marriage; by whom, had she been animated by the fears of a guilty conscience, her deception would have seemed only too likely to have been uncovered to him. Not only once, but every successive summer until and including that just before his death was the visit repeated. It strains credulity to the breaking point to believe that even though for twenty years spent in the unbroken intimacy of married life she herself had been continually on her guard, no one of the many who knew her early trouble, ever in any of their visits, dropped before him a remark that, with a man of his caliber, would have developed inquiry and divulging of the truth. He lived with her twenty years; trusted her to rear his children, provided for her comfort in life, and preferred her above any other in death, and it seems to me impossible that this affectionate trust was from the beginning to the end founded on a cornerstone of fraud and deceit. In arriving at this conclusion the testimony of the witness William Dove has not been overlooked. He says that when he was nineteen

years of age (fifty-one years before he was called as a witness and about a year after her second marriage) Mrs. Price told him that she had seen her former husband go by the house on Forty-third street, where she lived, and cautioned him not to mention it to any of the family. Accepting, if we may, this as an accurate statement of an admission by her it yet serves very little purpose. Whether she saw him after or before her marriage to Mr. Price does not appear, and whether she in fact saw him must depend upon our arbitrary judgment as to the correctness of her identification of a man of whom she had but a fleeting view as one she had not seen for seventeen years or more.

That her apprehensions were aroused may be believed and that she did not wish to have the subject reopened for discussion among her family and friends may be true (although, if so, why she should at the same time take a mere youth into her confidence seems strange), but this is far from proving that she saw Mr. Hilton or that she failed to acquaint Mr. Price with the occurrence.

The accuracy of testimony as to admissions is, however, always open to suspicion, and that under consideration appears to be especially so.

The witness is an old man, for years a sufferer from diabetes, too infirm to appear in court, admittedly of failing memory, and withal a man disappointed at the non-appearance of his name in Mrs. Price's will, and one of the contestants of its probate.

The story he tells is of an occurrence happening more than fifty years before, unlikely in view of the known conditions, and, to my mind, cannot be credited, in contradiction of logical inferences drawn from established facts.

Turning to the question of the marriage between

Mr. and Mrs. Price with the legitimacy of the issue, it may be said briefly that every presumption is in favor of its validity. Before it can be nullified each and every presumption which can be indulged for its support must be met and overcome by plaintiffs, upon whom that burden rests. *Fenton* v. *Reed,* 4 Johns. 52; *Hynes* v. *McDermott,* 91 N. Y. 457; *Matter of Matthews,* 153 id. 443; *Matter of Biersack,* 96 Misc. Rep. 161; 179 App. Div. 916; Id. 931; *Barker* v. *Barker,* 92 Misc. Rep. 390; 172 App. Div. 244; *Fagin* v. *Fagin,* 88 Misc. Rep. 304; *Price* v. *Tompkins,* 186 App. Div. 936.

The evidential facts establish that upon March 12, 1848, Mrs. Price entered into a ceremonial marriage with H. Seymour Hilton at Lyons, N. Y., which ceremony was performed by Rev. D. Nutton, at that time pastor of the Methodist Episcopal Church in that village.

It may also be deemed as proven that following such marriage she lived with Mr. Hilton as his wife for about one month.

Beyond this, however, plaintiffs were called upon to establish as part of their affirmative case, among other things:

a. That Mr. H. Seymour Hilton was at the time competent to marry.

b. That Hattie E. Mitchell was at the time of the marriage to him competent to marry.

c. That the marriage to Mr. Hilton had not at the time of her marriage to Mr. Price been dissolved or annulled by decree of the court.

d. That Mr. Hilton was living at the time of her marriage to Mr. Price.

e. That Mr. Hilton had not been sentenced to imprisonment for life.

f. That Mr. Hilton had not absented himself for

five successive years last past before her second marriage without being known to her to be living during that time.

g. That after her marriage to Mr. Price, she had knowledge, or facts sufficient to charge her with knowledge, that her first husband was still living.

Each of these enumerated matters stands as a presumption in favor of the validity of the marriage until rebutted by evidence.

No attempt to rebut any, except the last two, has been made; as to the two excepted the only proof offered against them is the alleged admission of Mrs. Price to Mr. Dove to which reference has already been made and its insufficiency pointed out.

The subject was most carefully considered by Mr. Justice Rodenbeck in one of the preliminary motions had in the action (*Price* v. *Tompkins, supra*), and his conclusion that neither fraudulent inducement of the marriage by Mrs. Price nor its invalidity because of her former marriage could be legally found from the allegations of the complaint, was affirmed without opinion by the Appellate Division, 186 App. Div. 936.

The evidence upon the trial has followed closely those allegations, and my determination upon the facts, as well as the law of the case so established, is that the marriage attacked was legal and binding, and that no fraud, deceit or concealment by Mrs. Price has been shown.

In view of these conclusions, this opinion, already too extended, need not be lengthened by the discussion of the question whether the decrees of the surrogate of New York county sought to be avoided are as between these parties *res adjudicata*.

Judgment in accordance with the foregoing is directed, with costs.

Judgment accordingly.