RAYMOND MACE *vs.* CECELIA E. MACE.

DECEMBER 3, 1941.

ON REARGUMENT JANUARY 9, 1942.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker & Condon, JJ.

CONDON, J. This is a petition for divorce under general laws 1938, chapter 416, § 1. It is here on respondent's exception to the decision of the superior court granting the petition. The respondent is *non compos mentis* and was so at the time of the bringing of the petition against her and at the hearing thereon in the superior court. She was accordingly represented by a guardian *ad litem* who, in that capacity and also as her solicitor, took care of her interests in that court and also in this court.

Respondent by her guardian *ad litem* excepted to the decision of the superior court on the grounds that it was against the law, against the evidence, and was clearly erroneous. The superior court granted the petition on the ground that the respondent had at the time of her marriage to the petitioner committed fraud in concealing from him the knowledge that she was afflicted with a venereal disease. Respondent contended before us that such concealment was not ground for a divorce after the marriage had been consummated; that even if it was such a ground, it was waived by the petitioner living with the respondent and sleeping with

her in the same bed after knowledge that she had such a disease.

At the hearing in the superior court and in this court both parties apparently assumed that a decree of annulment of an otherwise valid marriage could be granted for fraud under § 1 of chap. 416. This statute provides in part that "in case of any marriage originally void or voidable by law" a divorce may be granted. In most jurisdictions where a divorce has been granted or an annulment decreed for fraud such ground is expressly prescribed by statute. *Reynolds* v. *Reynolds*, 3 Allen (Mass.) 605; *Ryder* v. *Ryder*, 66 Vt. 158; *C.-* v. *C.-*, 158 Wis. 301; *Behrmann* v. *Behrmann*, 110 Conn. 443; *Svenson* v. *Svenson*, 178 N. Y. 54. In New Jersey, however, fraud has been recognized as ground for annulment of a marriage, irrespective of statute, under the general jurisdiction of courts of equity to relieve against frauds. *Carris* v. *Carris*, 24 N. J. Eq. 516; *Crane* v. *Crane*, 62 N. J. Eq. 21. But this court has denied such jurisdiction and has held that in Rhode Island divorce is purely statutory. *Leckney* v. *Leckney*, 26 R. I. 441; *Selby* v. *Selby*, 27 R. I. 172. In the *Leckney* case the ground alleged for annulment was a prior subsisting marriage of the respondent. Hence, the court was not called upon to construe the above-quoted language of § 1 in order to determine whether it included fraud because the marriage before the court was absolutely void, regardless of the fraud practiced on the petitioner.

Whether the language of our statute admits of a construction to include fraud does not appear to have ever been considered by this court. In *Wilson* v. *Wilson*, 16 R. I. 122, cited by the petitioner, which was a suit for divorce from the bonds of marriage, the ground was not fraud but cruelty. This was alleged to have been of various kinds, one of which was infecting his wife with syphilis. The question of fraud could not have been raised in that case, as the petitioner was seeking a divorce and not an annulment and was, therefore, con-

fined to the grounds for divorce expressly set out in the statute.

In the instant cause we think the question ought to have been explicitly raised, especially because of the mental incompetency of the respondent and because the petitioner is seeking an annulment and not merely a divorce. However, in view of the conclusion which we have reached on the whole cause, we shall assume, for our present purposes, without deciding, that fraud making a marriage voidable is a ground for a decree annulling it under § 1.

On the evidence the superior court found that the respondent had a venereal disease at the time of her marriage and that she fraudulently concealed such fact from the petitioner. It further found that because of such concealment the petitioner was entitled to the granting of his petition in which he prayed for a decree declaring his marriage to the respondent null and void.

Dissolution of the marriage bond by a decree of divorce may result in serious consequences of a social and pecuniary nature, not only to the immediate parties to the marriage but also to the state; but from a decree of annulment even more serious consequences may result. Hence, the vigilance with which the law guards the marital status, when an attack is made against its continuance, is intensified when made against its validity from the very beginning.

Annulment is a heritage from the ecclesiastical courts of England. There it was strictly hedged about with safeguards against easy procurement. Few and well defined were the causes that would justify an annulment, and the evidence necessary to prove any such cause was required to be of the highest nature. While the jurisdiction of the English ecclesiastical courts appears never to have been established here, much of the law administered by those courts was adopted by our courts of common law when they were called by statute to exercise jurisdiction over the marital status. Consequently, it has been the practice generally of our courts to limit rather than to extend such jurisdiction, thus conserving

the ancient policy of the law relative to the indissolubility of the marriage bond and leaving it to the legislature to alter or modify such policy.

In accordance with this view, it appears that the proof of a ground for annulling an otherwise valid marriage must be clear, strong and convincing. Assuming then that the fraud alleged here is a ground for a decree of annulment, the question before us resolves itself into the rather narrow one whether, on all of the evidence and the inferences reasonably to be drawn therefrom, the superior court was clearly wrong in granting the petition.

Because of the view which we take of the evidence we need not decide at this time whether consummation of the marriage constituted a bar to its annulment irrespective of proof of the alleged fraud. To decide this question we would be forced to resort to authorities outside this state, and such authorities are in conflict. *Vondal* v. *Vondal,* 175 Mass. 383, 56 N. E. 586; *Svenson* v. *Svenson, supra; Di Lorenzo* v. *Di Lorenzo,* 71 App. Div. 509; *Ryder* v. *Ryder, supra; C.—* v. *C.—,* 158 Wis. 301; *Watson* v. *Watson,* 143 S. W. (2d) 349, (Mo. App.); *Lyndon* v. *Lyndon,* 69 Ill. 43.

From the evidence, which is substantially undisputed, it appears that the petitioner and the respondent were secretly married in Massachusetts on June 24, 1932, and resided continuously thereafter in Rhode Island. They admittedly cohabited as man and wife until August 23, 1933, when the respondent was admitted to the Charles V. Chapin hospital in Providence for observation of a mental disorder. On the next day she was transferred to the psychopathic department of the hospital and remained there until she was discharged on August 30, 1933, at the request of and in the care of the petitioner but against the advice of the hospital officials.

The respondent upon her admission to the hospital stated that she had suffered from a venereal disease with which she was afflicted before her marriage. On August 28, 1933 a Wasserman test was made at the hospital and was reported doubtful. A test of respondent's spinal fluid "showed no

evidence of syphilis of the nervous system." On August 24, 1933, respondent's disorder had been diagnozed as "schizophrenia" which Dr. Kiene, director of the psychopathic department, testified was "one of the most common mental diseases." Respondent was accordingly recorded on the hospital record as having "latent syphilis", which Dr. Kiene testified meant "evidence of syphilis which is dormant, which is not demonstrating any evidence of harmful effect on the body."

The petitioner first learned of this condition of the respondent when he took her from the hospital on August 30, 1933. He had respondent at home with him for about a month and a half thereafter and slept in the same bed with her. Apparently she received no treatment for her venereal condition either at the hospital or later while she was at home, and from the testimony of Dr. Kiene it is reasonable to infer that she needed none. Apparently also it was her mental condition alone that required attention, and it does not appear that this condition was one that grew out of or was incidental to her latent syphilitic condition; nor was it shown that schizophrenia was a result of syphilis in any of its stages and especially in a latent stage such as appeared in the respondent's case.

That the above view is correct further appears from the evidence. A little over a month after petitioner had taken the respondent from the Chapin hospital he sent her for further treatment of her mental condition to Butler hospital, in Providence, a private hospital for curable mental cases, where she remained for almost a year. She was then temporarily discharged and went to live at her mother's home. Petitioner also went to live there and slept in the same bed with the respondent. She remained at her mother's home two months and then returned to Butler hospital, where she stayed until February 1936, when she was discharged as incurable. It further appears that a Wasserman test made at this hospital was negative.

The respondent was transferred by the petitioner from Butler hospital to the State Hospital for Mental Diseases, where she is at present at the expense of the petitioner. It does not appear from the evidence that respondent is there for any other reason than her mental condition. Wasserman tests were also made there. According to the testimony of Dr. Kathleen Barr, who was appointed by the superior court to examine the respondent, and the records of her case at the several hospitals where she has been confined, none of these tests showed a positive case of syphilis but merely "a possibility of latent syphilis."

The respondent's personal physician, who treated her for a year or more prior to her marriage, testified by way of deposition that respondent had syphilis before her marriage and that he had treated her for the disease. This witness also testified that the respondent visited him at his office a year or more after her marriage and that later the petitioner came to him and he told the latter that he ought to send respondent to a hospital for observation, as she might be having trouble from this disease or "she might have mental changes entirely remote from her blood disease." It was as a result of this advice that petitioner had respondent admitted to the Chapin hospital.

It is not clear to us, from all the evidence, that respondent had syphilis in a communicable form on the date of her marriage on June 24, 1932. The petitioner and respondent cohabited as man and wife for over a year immediately following their marriage and there is no evidence that petitioner became infected with syphilis. This in itself is some degree of proof that if respondent was in a syphilitic condition at the time of the marriage the disease was then in the same latent form that it was when she was admitted to the Chapin hospital and when, to use the language of Dr. Kiene, it was "not demonstrating any evidence of harmful effect on the body."

The inescapable inferences from the evidence, as we view it, are that this respondent did not have communicable

syphilis at the date of the marriage and, furthermore, that petitioner did not, at the time he first learned of his wife's blood condition or within any reasonable time thereafter, feel that he had been fraudulently led into a marriage which he would have avoided had respondent not concealed her condition from him. When knowledge came to him of her condition he did not act as one who had been defrauded. The inference is plain from his conduct that so far as his marriage was involved he evinced not the slightest indication of seeking an annulment thereof on that ground, so long as there was some hope of a cure of her mental disorder. It was not until after respondent had been discharged from Butler hospital as probably not curable of her mental disorder and after she had been for a considerable period of time at the State Hospital for Mental Diseases, without any apparent improvement, that he decided to seek such annulment. In other words, the realization that he was to be burdened with an incurably insane wife seems to us to have been the motivating cause of his petition for an annulment.

The petitioner filed his petition in the superior court on February 6, 1940, almost six and a half years after he first learned of his wife's blood condition. This was the first indication either by word or conduct that he considered his marriage a nullity because of his wife's failure to inform him of such condition before the marriage ceremony. At no time did he ever tell her that he considered the marriage a nullity; nor does it appear that he ever so informed either her sister or her mother, although her sister lived for a time in his house when the respondent came home from Butler hospital, and although he and his wife lived at her mother's home and slept in the same bed.

Such conduct in our opinion raises a strong inference of a contrary intention, namely, to treat the marriage as subsisting and binding regardless of the knowledge which had come to him of his wife's blood condition. To state it in another way, he waived whatever right he may have had on August 30, 1933, the day on which he first learned of his wife's blood

condition, or within a reasonable time thereafter, to have his marriage declared null and void for fraudulent concealment. In order to establish such a waiver it was not necessary for respondent to show that she had sexual intercourse with petitioner after he learned of her condition. He testified that he did not thereafter have such intercourse and the superior court found as a fact that he did not. That he did not have such intercourse is not necessarily decisive of the question whether he waived his right to have the marriage annulled for fraud. Proof of other facts may be sufficient to show that he condoned the fraud and waived his right to set it up as a ground for divorce. *Phinizy* v. *Phinizy*, 154 Ga. 199.

For the reasons above stated, we are of the opinion that the decision of the superior court was clearly erroneous in failing to draw inferences from the evidence plainly unfavorable to the petitioner. In a cause where, as here, the party charged with fraud was mentally incompetent to testify in her own behalf, it was especially incumbent upon the superior court to apply the rule of strict proof and to weigh, against petitioner's uncorroborated testimony, the reasonable inferences to be drawn from petitioner's conduct over a long period of years.

In our view, that court does not appear to have done this but to have relied largely, if not solely, on petitioner's testimony that he did not have sexual intercourse with his wife at anytime after learning of the alleged fraud. The superior court seems to have been of the opinion that it was necessary for the respondent to prove such intercourse in order to establish her claim of waiver by the petitioner of any right to an annulment of their marriage for her alleged fraud. As we stated above, mere failure to make such proof is not conclusive that there was no waiver.

For the reasons above stated, respondent's exception is sustained. The petitioner may appear before this court, if he shall see fit, on December 19, 1941, and show cause, if any he has, why the cause should not be remitted to the superior court with direction to dismiss the petition.

PER CURIAM. In accordance with the opinion of this court rendered December 3, 1941, the petitioner has been given opportunity to show cause why an order should not be made remitting the case to the superior court with direction to dismiss the petition.

The petitioner has now appeared by counsel in accordance with the permission given him. After such hearing, the court finds no cause has been shown to induce it to change its opinion heretofore rendered, and it is ordered that the case be remitted to the superior court with direction to dismiss the petition.

*Edward Winsor, Edwards & Angell,* for petitioner.
*Francis J. Barlow,* guardian *ad litem,* for respondent.