(8 Misc. Rep. 587.)

### KING v. BREWER.

(Superior Court of New York City, Equity Term. May 19, 1894.)

MARRIAGE—ANNULMENT FOR FRAUD.
    A marriage will be annulled on the ground that it was procured by fraud (Code Civ. Proc. § 1743, subd. 4), where it appears that plaintiff married defendant after having been acquainted with him for several years,

and after diligent inquiry into his character had disclosed nothing un-
favorable, and it appears that after the marriage plaintiff discovered he
was engaged in conducting a pool room, which is a crime under Pen. Code,
§ 351.

Action by Martha M. King against Thomas C. Brewer to annul a
marriage contract. Judgment for plaintiff.

James R. Fancher, for plaintiff.

GILDERSLEEVE, J. The question here presented is a delicate
and unusual one. The action is brought to annul a marriage con-
tract, under section 1743, subd. 4, of the Code, on the ground that
the consent of plaintiff was obtained by fraud. The state of facts
upon which the charge of fraud is based is as follows: The parties
were married on the 12th of April, 1893. The defendant, at that
time, seems to have enjoyed a good reputation in society, as a young
man who attended church, and acted the part of a law-abiding citi-
zen, of good moral character. The plaintiff had known him for some
years, and, for two years previous to the marriage, quite intimately.
She believed him to be a man worthy of her affection. The plaintiff
herself was at the time of the marriage about 20 years of age, and
was a young lady, apparently, of religious instincts and refined
nature, and enjoyed the respect and esteem of the society in which
she moved. Her brother, who seems to have stood in the place of
guardian to her, as her father was dead, made investigations prior
to the marriage concerning the character and antecedents of de-
fendant, and was satisfied that there was nothing against his char-
acter. Her pastor also seems to have had a good opinion of defend-
ant, and, from all her friends who knew defendant, she apparently
heard nothing that would tend to cause her any doubt of defend-
ant's good moral character. With this opinion of defendant, she
consented to marry him. It seems, however, that, for some time
previous to his marriage, defendant kept a pool room, unknown to
plaintiff. Ostensibly, he carried on business as a stationer, and
was apparently engaged in earning an honest livelihood; but he
also, at the same time, ran a pool room, which is an offense punisha-
ble by imprisonment for one year, or by a fine of not over $2,000,
or both. See Pen. Code, § 351. The plaintiff and defendant lived to-
gether as man and wife from the date of their marriage, i. e. April
12, 1893, until about August 1, 1893, when defendant was arrested
on a charge of obtaining money under false pretenses, and was
placed in Ludlow Street Jail, where he remained about a month,
and was then released. The testimony is very meager on this point,
and I do not know whether he was let out on bail, or whether the
matter was adjusted in some way. The plaintiff was made aware
of his offense, but seems to have, in a measure, condoned it, for she
visited him in prison, and seems to have acted like a model wife
under trying circumstances. Her explanation of this is as follows:
"I thought it was his first offense. I thought that if he came out
he would do what was right. * * * He promised me he would." She
also swears that, after her marriage, defendant admitted to her that
he had kept a pool room during some months previous to their mar-

riage; but at what time after the marriage he made this confession does not appear, so it is difficult to determine whether or not she also condoned this fault or deception by continuing to live with him, or whether she left him immediately afterwards. After his release from prison, he again ran counter to the law, and got into trouble, by running a Pontiac bank, whereupon plaintiff left him for good, resumed her maiden name, and has since refused to have anything to do with him, except that on one occasion, in November, 1893, she consented to grant him an interview, but refused, apparently, to become reconciled to him. Indeed, she swears she has not cohabited or lived with him since the month of August, 1893. On April 10, 1894, about one year after her marriage, she brought this action to annul the marriage contract. The defendant has not appeared in the action, but has allowed the case to go against him by default.

The question here to be determined is, do the above circumstances constitute a fraud on plaintiff by defendant, in procuring her consent to the marriage, within the meaning of section 1743, subd. 4, of the Code? Plaintiff, at the time of the marriage, believed defendant to be a good man, whereas, in point of fact, he had kept a pool room, and to that extent was a man of criminal propensities. These propensities were further developed after the marriage, but they existed at the time of the marriage, although they were not discovered by plaintiff until after the marriage. Would plaintiff have consented to marry the defendant had she known that he was, or had been, engaged in a criminal occupation, and was a man of criminal propensities? Presumably not, although, as I have said, it is difficult to determine from the evidence whether or not she condoned his deception in concealing from her the fact that he had kept a pool room previous to his marriage. Certainly, it would seem to have been a deception on the part of defendant to keep the plaintiff in ignorance of his pool room until after the marriage. Plaintiff did not rush blindly into the marriage, but had excellent reasons for supposing defendant to be a worthy person. Subsequent to the marriage she discovered that she had been deceived in defendant's character, and that at or shortly before the time of his marriage he had been engaged in a criminal occupation. Since the marriage the bad character of defendant has become of common repute, through newspaper notoriety. It certainly seems a very hard fate for a young woman, scarcely out of her teens, to find herself bound to a man of criminal instincts, whom at the time of the marriage she had supposed to be, and had good reason to believe was, an honest and worthy man. But if, after full knowledge of the facts constituting the fraud or deception, she voluntarily continued to cohabit with defendant, she cannot maintain an action for the annulment of the marriage. Code, § 1750. The testimony on this point is not very satisfactory. She learned, after the marriage, that he had kept a pool room previous to the marriage; but whether or not she left him immediately after such fact had come to her knowledge, or not, does not appear. When he was arrested for obtaining money on false pretenses, she visited him in prison, and sympathized with him, because she thought it was "his first offense," and that he

would do better after he got out. This would imply that at that time she had not yet heard of the pool room, since she thought the charge upon which he was arrested was his first offense. It appears from the testimony that after he came out of jail she did not again cohabit with him. I think, therefore, it is safe to assume that she did not condone the fraud or deception by voluntarily cohabiting with him, with a full knowledge of the facts constituting the fraud. When I look for some precedent to sustain a decree of annulment herein, the result is not encouraging, but the authorities on the other side are not conclusive. The case of Klein v. Wolfsohn, 1 Abb. N. C. 134, would seem to hold against plaintiff. But in that case the plaintiff "blindly relied upon defendant's representations as to his character and property," and "heedlessly" entered into the marriage, without informing herself of the character and means of defendant, whereas in the case at bar the plaintiff had excellent reasons for believing implicitly in the good character of the defendant. She had known him intimately for two years, and every one spoke highly of his moral worth, including those in whom she had perfect confidence, i. e. her brother, who had made investigations as to defendant's character, her pastor, and others. Let us reverse the position of the parties in the case at bar. Let us suppose the wife bore an excellent reputation, and every one spoke highly of her, and those who knew her, and in whom the husband had perfect confidence, assured him that she was above all reproach, and he married her, believing her to be a good, virtuous woman; and then suppose that, after the marriage, he learned that she had been, at the time of the marriage, a prostitute. Could he not maintain an action to annul the marriage for fraud? I think he certainly could. See Carris v. Carris, 24 N. J. Eq. 516; Scott v. Schufeldt, 5 Paige 43. And why, then, should not the same rule hold good where the positions are reversed, and it is the wife who seeks to have the marriage annulled, and to be freed from a criminal, whom she has married in the conviction that he was a good and worthy man? This court, at equity term, has gone very far in maintaining this proposition. In the case of Keyes v. Keyes, 6 Misc. Rep. 355, 26 N. Y. Supp. 910, the doctrine is laid down that where defendant, by fraudulently representing himself as an honest, industrious man, induced plaintiff to marry him, when in fact he was a professional thief, whose picture was in the rogues' gallery, and who at the time of the trial was in state prison, the case was within the provisions of section 1743 of the Code, and that a decree of nullity on the ground of fraud should be granted. The facts in that case are not quite the same as in the case at bar, but the same principle applies to both cases. The learned counsel for the plaintiff, in his excellent brief, cites a number of cases tending to show the gradual progress from a somewhat puritanical view of the subject, as exemplified in the case of Scroggins v. Scroggins, 3 Dev. 535, towards a more liberal view, as manifested in the case of Keyes v. Keyes, above referred to. I do not think that any of the cases can be regarded quite as a precedent for the case at bar, although some of them go far towards sustaining this court in granting the decree here asked for. In this case, as in

the Keyes case, there will be no children to suffer by reason of the annulment of the marriage. Justice and right seem to require the separation of these two lives, so wrongly and unfortunately united. A court of equity does not go too far when it gives this young plaintiff, who has been grievously wronged while doing no wrong herself, the opportunity to commence life again free and untrammeled. After a careful consideration of the circumstances of the case, I am of opinion that a decree annulling the marriage contract should be granted.