DI LORENZO v. DI LORENZO.

(Supreme Court, Appellate Division, Second Department. April 18, 1902.)

1. MARRIAGE—ANNULMENT—JURISDICTION ON APPEAL.
Failure of defendant's counsel in an action to annul a marriage to make all the motions, objections, and exceptions which would be necessary in an ordinary action to secure a review cannot defeat the jurisdiction of the court on appeal to review the case; the state having an interest in the disposition of such a question, which cannot be waived by individuals.

2. SAME—FRAUDULENT REPRESENTATIONS—RIGHT TO ANNULMENT.
Plaintiff's wife, according to his testimony, when she first met him, requested him to live with her, which he did, because he thought she was married. After living with her for several months, he went to another town, and while there received a letter stating that she was about to be confined and asking for money, which he sent. Afterwards she exhibited to him a child, stating that he was its father, and demanding that he marry her. He at first attempted to buy her off, but failing, and fearing threatened arrest, married her about a month later, having lived with her meanwhile. They continued to cohabit as man-

and wife for eight years, when plaintiff left her, and about a year later discovered that she had never been delivered of a child. *Held* insufficient to entitle plaintiff to the annulment of the marriage.

Goodrich, P. J., and Jenks, J., dissenting.

Appeal from special term, Kings county.

Action by Gregorio di Lorenzo against Johanna di Lorenzo. Judgment for plaintiff (70 N. Y. Supp. 1012), and defendant appeals. Reversed.

Argued before GOODRICH, P. J., and BARTLETT, JENKS, WOODWARD, and HIRSCHBERG, JJ.

Edward Hymes, for appellant.
Frederic A. Ward, for respondent.

WOODWARD, J. This action was brought for the purpose of annulling the marriage celebrated between the parties at the city of New York on November 18, 1891, on the ground that plaintiff's consent thereto was procured by fraud. The fraud alleged is that the defendant, the wife, had falsely represented to the plaintiff, and had caused him to believe, that shortly before said marriage she had been delivered of a male child, of which he was the father, then and there producing a child, and exhibiting the same to him, when, as a matter of fact, she had not given birth to such child, and that the plaintiff, believing this story, was induced to marry the defendant. The defendant interposed an amended answer, denying the fraud, and alleging, by way of avoidance, that she was married to plaintiff in the month of September, 1890, by a minister, and that they had thereafter lived together as man and wife, and that at the request of the plaintiff a civil marriage was performed in the month of October or November, 1891. On issue being joined, defendant moved for a jury trial, and specific questions of fact were accordingly framed by the court, which came on for trial, and were tried at a trial term held at Brooklyn in April, 1901. The jury, answering the questions, found that there was no prior ceremonial marriage between the parties in September, 1890; that on or about October 28, 1891, for the purpose of inducing plaintiff to marry her, the defendant falsely and fraudulently represented to him that on or about October 5, 1891, and during the absence from the state of New York of the plaintiff, she had given birth to a male child, of which he was the father, and that she then and there produced and exhibited said child to plaintiff; that plaintiff, relying upon said representations of defendant, and believing same to be true, married defendant on November 18, 1891, and that defendant had not given birth to said male child, or to any child, in the months of September or October. Upon the coming in of this verdict, the court, at special term, made a decision embodying the findings of the jury, and directed judgment for the plaintiff, annulling the marriage, which judgment has been duly entered of record. The defendant appeals to this court.

The question to be decided upon this appeal is whether the facts as found by the jury, embodied in the decision of the learned court

at special term, are sufficient to entitle the plaintiff to the judgment
appealed from; and we are of opinion that this question is not with-
out the jurisdiction of this court because defendant's attorney may
not have made all of the motions, objections, exceptions, etc., which
would in an ordinary action be necessary to secure a review. The
state has an interest in the disposition of questions of this char-
acter, which cannot be waived by individuals. Marriage is some-
thing more than a contract, though founded on an agreement of
the parties. When once formed, a relation is created between the
parties which they cannot change; and the rights and obligations
of each depend, not upon their agreement, but upon the law, statu-
tory or common. It partakes of the character of an institution
regulated and controlled by public authority, upon principles of
public policy, for the benefit of the community (2 Beach, Mod. Cont.
1638); and it follows necessarily that the mere inadvertence or
neglect of an attorney to follow the correct form of procedure can-
not give the court jurisdiction to annul the marriage contract, un-
less the facts proven justify the judgment.

The plaintiff's own version of the matter, which is the one ac-
cepted by the jury, is that he met the defendant in May, 1890, in
the city of New York, and that she was at that time known as Annie
Smith; that shortly after meeting her the defendant requested him
to live with her, and that he complied with her request—

"Because I thought it was a married woman. I went to live with her at
150 East Twenty-Seventh street, in the city of New York. I remained living
with her there four months. After I left Twenty-Seventh street, I went to
live with her at No. 11 Perry street, in the city of New York. That was
about October, 1890. I continued to live in Perry street from October to the
21st of April, 1891, and she continued to live with me until that time."

At the date last mentioned the plaintiff went to Philadelphia to
live, remaining there about four months, when, as a member of the
Seventh Regiment Band, he went to Baltimore and Pittsburg, and
was in the latter city in September, 1891. At about that time he
received a letter from the defendant in which she told him that she
was about to be confined in a hospital in Philadelphia, and that she
needed money for clothes for the child. In response to this letter,
plaintiff sent the defendant some money at Philadelphia, and the
next that the plaintiff tells us is that:

"I saw her after that time when I came back from the tour from the band.
That was about the 21st of October, 1891. I came to 11 Perry street, in the
city of New York. The defendant was there. What happened then was,
she told me, 'That is your baby.' She showed me a baby. It was about
three weeks old, only. * * * The conversation that I had with her at
that time about that child, as I recollect it, was: 'You know what you got
to do. You better marry me at once; otherwise I going to have you ar-
rested.' 'Well,' I said, 'We don't need to do that. I am going to settle
with some money.'"

This the defendant refused, and insisted upon marriage, stating
at the time that she had been faithful to the plaintiff during his ab-
sence. Some idea of the plaintiff's code of ethics may be gathered
from his answer of the question addressed to him by his own coun-
sel:

"Did you, believing and relying upon the truth of what she had stated to you, marry her because of that belief?"

His answer was:

"Yes; I believed her. I believed all she said about it. This marriage took place in the city hall, New York, on the 18th of November, 1891. Rather than to marry her, I offered her some money, but she refused that. About a year before I had some trouble with her, which I settled by the payment of some amount of money.—$300,—a note. That was the 6th of January, 1890. I thought I could settle this matter with pay just so well as the other. But, instead,—I believed the child was mine,—I looked at my conscience, and, afraid to be arrested, I did marry her."

Having failed to pacify the defendant with money, and having the fear of arrest in his mind, the plaintiff looked into his conscience, and decided to marry the defendant; and a court of equity is asked to hold that this delicately adjusted conscience was so far defrauded that after the marriage was fully consummated, and the parties had lived together for a period of about eight years, it is its duty to annul this contract, and to leave the plaintiff free from the obligations thus assumed. The plaintiff, resuming his testimony, says that the child showed to him in November, 1891, died the 13th day of January, 1892,—about four months old. "There has never been any other, or any issue,—any child born to me and her,—since that marriage, in November, 1891. We continued to live together as man and wife after the marriage of November, 1891, until January 1, '99. That is over a year ago. We then separated. I have not cohabited with her—I have not slept with her as man and wife—since January, 1900. I discovered for the first time the facts upon which I base this allegation in this action, that she never gave birth to a child, in January 10, 1901, this year." It will be observed that the plaintiff does not state in his evidence that he ceased to cohabit with the defendant because of the discovery of the alleged fraud. They had separated in January, 1899, and the alleged discovery was not made until January 10, 1900, after the defendant had brought an action for divorce against the plaintiff, so that there is none of the virtuous indignation of a man who has been deceived and defrauded, and who has left his wife because of a feeling that he cannot consent to live with one who has wronged him, but the discovery is made for the purpose of retaliation upon the defendant, who has sought to be divorced from him within this state. The plaintiff knew the defendant before he married her; knew that she was a woman who had appeared under at least three names; knew, if his testimony is to be relied upon, that she solicited him to live with her almost immediately on meeting him, and that she had cohabited with him for a period of several months. There is nothing to indicate that he evidenced any surprise, or that he took anything more than a passing interest in the alleged birth of his son, his principal anxiety being to avoid arrest; and, if it be conceded that the failure of the defendant to give birth to the child was such a fraud as under other circumstances might be sufficient to vitiate a contract in which individuals alone were interested, it may well be questioned whether he is in a position to urge it. He knew facts which should have

75 N.Y.S.—56

put him upon his guard. He says that, rather than to marry her, he was willing to pay her money; and, if the actual birth of the child was material to the contract, he had full opportunity to inquire into the facts, for the evidence shows that while the original display of the child, and demand of marriage, were made on the 21st day of October, 1891, the marriage did not take place until the 18th day of November, and during this period of nearly one month he continued to live with the defendant just as he had done before, with no effort whatever to determine whether the child which was offered as an exhibit was in fact the offspring of the defendant. It does not appear that the child was of the essence of this contract of marriage. The defendant himself tells us that rather than marry her, after seeing his alleged child, he was willing to pay her money, and that he offered to do so. It was only after she had refused this money, and after the defendant had repeatedly importuned and threatened him, during a period of nearly a month, that he looked down into the depths of his conscience, and decided to marry the defendant. He was, as he himself admits, willing to bastardize one whom he believed to be his own offspring, if this could be done by the payment of money and the avoidance of his own arrest; and yet we are asked to hold that he was defrauded in his marriage with the defendant, because, as a matter of fact, no child was born of their immoral relations. No appellate court in the state of New York has ever sanctioned such a doctrine. We do not believe that it will. The exact question has never been adjudicated in this state, so far as we are able to discover after a careful research, nor yet in any jurisdiction which would form a controlling precedent here; but there are a number of cases bearing some analogy to the case at bar, which, in view of the conflicting conclusions as to some of them, may profitably be considered in an effort to arrive at the correct rule in such cases:

In the early case of Scott v. Shufeldt, 5 Paige, 43, where the parties were white persons, and the complainant was charged by the oath of the defendant as the putative father of her bastard child, and the complainant thereupon, believing the child to be his, married her, to obtain his discharge from the proceedings against him under the bastardy act, and he subsequently ascertained that the child was a mulatto, and that the defendant knew that fact at the time she swore it to be his,—she then having been delivered, and having seen the child,—it was held that the complainant was entitled to a decree declaring the contract void on the ground that his consent was obtained by fraud. This marriage was never consummated by cohabitation, and the learned chancellor says that, if the child had not been born at the time of the marriage, the complainant would have had some difficulty in showing that he had been intentionally deceived and defrauded by the defendant, as she might possibly have supposed the child to be his, although she had also had connection with a negro about the same time. This case holds only that the plaintiff could not be called upon to father the child of a negro, when the defendant knew at the time that the plaintiff could not have been the father of her child. It is no authority for the annul-

ment of a consummated marriage where there has in fact been no child born to the defendant.

The case of King v. Brewer, 8 Misc. Rep. 587, 29 N. Y. Supp. 1114, decided at an equity term of the superior court of New York, which would appear to hold almost any kind of a misrepresentation as a sufficient ground for annulling a marriage, has never been sanctioned by an appellate court, and was specially disapproved in Fisk v. Fisk, 6 App. Div. 432, 436, 39 N. Y. Supp. 537, in which we fully concur.

In Tait v. Tait, 3 Misc. Rep. 218, 23 N. Y. Supp. 597, the more wholesome doctrine is laid down that if a woman pretends to a man that she is pregnant by him, and she is not pregnant at all, but he marries her, believing her representations to be true, he cannot have the marriage set aside for fraud, even though the marriage was never consummated by cohabitation; and we cannot believe that the rule is different because the woman has accompanied her false pretense by dramatic accessories, intended, in the language of a popular opera, to "give verisimilitude to a bald and unconvincing narrative." See Hoffman v. Hoffman, 30 Pa. 417; Shrady v. Logan, 17 Misc. Rep. 329, 40 N. Y. Supp. 1010.

In the case of Ferlat v. Gojon, 1 Hopk. Ch. 478, a marriage procured by abducting a young woman, and compelling her, under fear, to acquiesce in the ceremony, was set aside; it appearing that the marriage was not voluntarily entered into, and that it was never consummated; the young woman returning to her friends, and at once disclaiming the act. The learned chancellor declares: "The complainant never consented freely to become the wife of the defendant; she never cohabited with him; and this marriage was a foul fraud practiced upon her by the defendant,"—language none too strong for the facts disclosed by the evidence.

In Wightman v. Wightman, 4 Johns. Ch. 343, where the fact of the insanity of the plaintiff at the time of the marriage, as charged in the bill, and the fact that the parties had never since lived together, or in any manner cohabited with each other, were proved to the satisfaction of the chancellor, it was held that, as a necessary consequence of these conditions, the marriage was null and void from the beginning, by reason of the want of capacity in the plaintiff to contract, and had never since obtained any validity, because the plaintiff had never, since the return of her lucid interval, ratified or consummated it. See Lewis v. Lewis (Minn.) 46 N. W. 323, 9 L. R. A. 505, 20 Am. St. Rep. 559, and authorities cited in notes.

In an anonymous case (21 Misc. Rep. 765, 49 N. Y. Supp. 331), where the husband had, previous to his marriage, represented himself to be in sound health, when in fact he was afflicted with a chronic and contagious venereal disease, which he communicated to his wife, causing her great suffering, which continued up to the time of the trial, it was held that the facts justified an annulment of the marriage upon the ground that the husband had been guilty of a fraud. In this case the wife, immediately upon discovering the condition of her husband, separated from him, and refused to live with him. The learned referee, whose opinion appears to have been accepted by the court, placed his decision upon the ground that, "where-

either party is in such a physical condition that the discharge of the marital function will afflict the other with a loathsome disease, he or she is, in my opinion, not 'physically able' to meet the marital obligations"; thus following the rule suggested in Fisk v. Fisk, supra. But in Vondal v. Vondal, 175 Mass. 383, 56 N. E. 586, 78 Am. St. Rep. 502, where the wife was afflicted with syphilis, and knew of her disease at the time of her marriage, concealing the same from her husband, it was held that this did not permit of the annulment of the marriage, where the parties had lived together for a period of four months, and the marriage had presumptively been consummated.

In Donnelly v. Strong, 175 Mass. 157, 55 N. E. 892, the husband alleged as a ground for annulment of his marriage with the defendant that she had represented to him that "she was unmarried, that she had never been married, that she had never before been in the family way, and that she had never had sexual intercourse with any other than him." The court say:

"These representations, so far as they related to her previous chastity, form no ground for decree of nullity, if for no other reason than that the libelant himself knew that at the time they were made she was unchaste, and was thereby put upon his guard; and this would be so even if her prior sexual intercourse had been illicit."

In Reynolds v. Reynolds, 3 Allen, 605, the court granted an annulment of the marriage where the wife, while representing herself to be chaste, was in fact pregnant by another man; and, in the careful discussion of the principles involved, the court say:

"It is not going too far to say that a woman who has not only submitted to the embraces of another man, but who also bears in her womb the fruit of such illicit intercourse, has, during the period of her gestation, incapacitated herself from making and executing a valid contract of marriage with a man who takes her as his wife in ignorance of her condition, and on the faith of representations that she is chaste and virtuous. In such a case the concealment and false statement go directly to the essentials of the marriage contract, and operate as a fraud of the gravest character on him with whom she enters into that relation. As has been already stated, one of the leading and most important objects of the institution of marriage, under our laws, is the procreation of children who shall with certainty be known by their parents as the pure offspring of their union. A husband has a right to require that a wife shall not bear to his bed aliens to his blood and lineage. This is implied in the very nature of the contract of marriage. Therefore a woman who is incapable of bearing a child to her husband at the time of her marriage, by reason of her pregnancy by another man, is unable to perform an important part of the contract into which she enters; and any representation which leads to the belief that she is in a marriageable condition is a false statement of a fact material to this contract, and, on well-settled principles, affords good ground for setting aside and declaring the marriage void."

But the court also say, "Nor is it unreasonable that each should take on himself the burden of inquiring into representations concerning the character and qualities of the person whom he intends to marry, which, by the exercise of due caution and discretion, can be ascertained to be true or false, instead of lying by and using them to defeat a contract after it has become executed, and a portion of its fruits has been enjoyed;" thus indicating that if the husband had himself been aware of the condition of the woman, or had known

facts calculated to put him on his guard, he would be denied relief. See Donovan v. Donovan, 9 Allen, 140. So in the case of Foss v. Foss, 12 Allen, 26, where a man married a woman whom he knew to be with child, and whom he had himself debauched,—being induced to marry her by an assurance that the child was his, and not taking any steps to ascertain its paternity, nor suspecting her of unchastity with any other man than himself,—the court refused to annul the marriage, although it appeared that the child must have been begotten by another man. In discussing this case, the court say:

"Whenever fraud is relied on as the ground of invalidating a contract, it is material not only to prove false and fraudulent representations, but also that they were made under such circumstances as to lead to a reasonable inference that the party was thereby deceived, and induced to enter into the contract which he seeks to avoid. If it appears that he had the means of ascertaining the falsity of the statements made to him, or that the nature of the transaction and the circumstances attending it were such as to put a reasonable person on inquiry, the presumption of deceit arising from proof of the fraud will be repelled, and the party will be left to bear the consequences of his own want of due diligence and caution. A party cannot escape from obligations which he has voluntarily assumed, on the ground that he has been deceived and defrauded, if he neglects to avail himself of means of information within his reach, or if he places a blind or willful confidence in representations which were not calculated to deceive a man of ordinary prudence and circumspection; for although he may have been, in point of fact, deceived and imposed upon, yet it is a consequence or result of his own folly or neglect. * * * These familiar and well-settled principles are to be observed and adhered to with scrupulous care and fidelity in their application to the contract of marriage,—a contract which, from its peculiar nature, and on grounds of public policy, the law regards as especially sacred and inviolable, and which cannot be avoided or set aside on the ground of fraud except on the most plenary and satisfactory proof of deceit and imposition touching matters which constitute the essentialia of the marriage relation."

The Massachusetts doctrine, as laid down in the cases cited, is followed in California; and in Franke v. Franke (Cal.) 31 Pac. 571, 18 L. R. A. 375,—a case in almost complete analogy to Foss v. Foss, supra,—the court refused to grant a decree of annulment, citing many authorities; among them, the Massachusetts cases. See, also, Crehore v. Crehore, 97 Mass. 330, 93 Am. Dec. 98; Smith v. Smith, 171 Mass. 404, 50 N. E. 933, 41 L. R. A. 800, 68 Am. St. Rep. 440; Donnelly v. Strong, supra; Vondal v. Vondal, supra; Todd v. Todd (Pa.) 24 Atl. 128, 17 L. R. A. 320.

In Kujek v. Goldman, 150 N. Y. 176, 179, 44 N. E. 773, 34 L. R. A. 156, 55 Am. St. Rep. 670, the court say:

"It is difficult to see why a fraud which, if practiced with reference to a contract relating to property merely, would support an action, should not be given the same effect when it involves a contract affecting not only property rights, but also the most sacred relation of life."

This is a wholesome doctrine, but it is to be understood, not in the abstract, but in connection with the facts then under consideration. The plaintiff in that action had been induced to marry one Kitty Moritz by the representations of the defendant that she was a pure and virtuous girl, when in fact she was pregnant by the defendant; and the court, in holding that the plaintiff could maintain an action for dam-

ages by reason of this fraudulent representation on the part of the defendant, made use of the language above quoted. If the facts had been proven that the plaintiff himself had been intimate with the girl, or that he had known of facts which were intended to put him on inquiry, it is not to be doubted that the court would have held that he was not in a position to be deceived by the statements of the defendant, and would have denied him a right of recovery.

As a result of these cases, we are of the opinion that the law is well settled that the degree of fraud sufficient to vitiate an ordinary contract may not suffice for the annulment of a marriage; that it is not enough that the party relied upon the false representations, and was deceived, or that important facts were concealed with intent to deceive; but that the marriage relation is a status controlled and regulated by considerations of public policy, which are paramount to the rights of the parties. When, however, the fraud is discovered before the marriage is consummated, and the innocent party refuses to cohabit, the marriage is so inchoate and incomplete that the status of the parties is similar to that of parties to an executory contract, and may be annulled without violating any considerations of public policy. We are also persuaded that, where a woman conceals the fact that she is pregnant by another than her future husband at the time of the marriage, the husband may have the marriage annulled for such fraud, unless precluded by his own conduct, and that a marriage will not be annulled for fraud where a woman induces a man to marry her by falsely representing that their illicit intercourse has rendered her pregnant, when in fact she is not pregnant. 19 Am. & Eng. Enc. Law, 1184, 1185, and notes; also 1187 and notes. The rule as laid down in Fisk v. Fisk, supra, and followed in the case of Wendel v. Wendel, 30 App. Div. 447, 452, 52 N. Y. Supp. 72, that if, when the relation is entered into, the party is competent to make that contract,—is mentally competent to do the duties which the contract involves, and physically able to meet its obligations,—nothing more can be required, is the law of this state upon this subject, and the plaintiff has failed to establish that the defendant was lacking in any of the elements essential to the contract. She was free to marry; she was not insane, nor yet an idiot; and from the fact that she cohabited with the plaintiff both before and after the marriage on November 18, 1891, we must assume that she was physically capable of meeting the demands entailed by entering into the contract of marriage. The plaintiff received all that he was entitled to under the contract, and the fact that his illicit relations with the plaintiff had not produced the offspring which the defendant exhibited to give strength to her representations worked no wrong for which the law, as at present established, affords him any right to have the marriage annulled.

The judgment appealed from should be reversed, with costs. All concur, except GOODRICH, P. J., and JENKS, J., who dissent.

GOODRICH, P. J. I dissent. By this appeal we are practically asked to sanction a scheme by which a woman who had been previously convicted at the court of special sessions, in the city of New York, of keeping a disorderly house, induced the plaintiff to marry

her on the false representation that he was the father of an illegitimate child of which she had been delivered, when in fact no such child had been born. The motive of the defendant's scheme may possibly be found in the fact that the plaintiff was worth $65,000. The plaintiff had been living in illicit relations with the defendant at, before, and after the time when the conception of a child might have taken place. The woman represented that a child was born on October 5, 1891. From May, 1890, till April, 1891, the parties had been continuously cohabiting. Consequently it was not strange that the plaintiff was induced to believe the false representation that he was the father of the child. I concede that, if it had been the fact, the plaintiff could not obtain an annulment of the marriage for that cause. In Scott v. Shufeldt, 5 Paige, 43, the court annulled a marriage between white persons where similar facts existed, except that a child was actually born, which the husband afterward discovered to be a mulatto, and consequently the child of a negro. The chief difference between that case and the case at bar is the fact that in the present case no child was born. We are therefore asked to say that when the woman exhibited to the man a child which she represented to be the fruit of their illicit cohabitation, when in fact no such child had been born, and threatened to institute bastardy proceedings against him, thus necessarily declaring her readiness and intention to enforce her threats by perjury in swearing that he was the father of the child, and by these means compelled a marriage, such marriage is not induced by "force, duress or fraud," under section 1743 of the Code of Civil Procedure. I think it is, and that we should not render any judgment which in the slightest degree might be construed as an approval of such a wicked prostitution of the very essence of the marriage contract. I vote for affirmance of the judgment.