GUSSIE MILLER RUBMAN, Plaintiff, *v.* LEIBISH PESACH RUBMAN, Defendant.

Supreme Court, New York County, July 1, 1931.

*Maxmilian Bader* [*Samuel Dickstein* of counsel], for the plaintiff.

*Jacob A. Rose*, for the defendant.

HAMMER, J. This action is brought by plaintiff wife for annulment of the marriage of the parties upon the ground of fraud. Plaintiff is thirty-three and defendant twenty-seven years of age. There is no issue of the marriage. Defendant did not personally appear upon the trial but through counsel contested the action. Several witnesses, who are his close relatives, admitted on cross-examination that they had not seen or heard from him and did not know his whereabouts. The fraud claimed presents another immigration quota case, which defendant's counsel claims is similar to and controlled by the recent decision of the Appellate Division in *Feig* v. *Feig* (232 App. Div. 172), reversing the judgment of annulment granted by the Special Term in Bronx county. The defendant, a citizen of Poland, temporarily residing in Cuba, knowing that if he could enter the United States at all within the quota law he could not do so for many years to come, concocted a fraudulent scheme to accomplish such entry as the husband of an American citizen. Pursuant thereto he falsely represented to plaintiff, who is an American citizen, that he had great love and affection for her, was financially able to support her, that he desired for such reasons to marry her, provide a home and live and cohabit with her as his wife in the United States. The plaintiff believed and relied on the defendant's representations. In direct consequence, for otherwise she would not have so acted, she entered into a civil marriage with him in Havana, Cuba, but the marriage was not consummated. She returned to the United States, petitioned the Department of Labor for a preference for her husband under the Immigration Law. The petition was approved. The United States Department of State authorized the American Consul at Havana to issue a preference visa, and that being done, the defendant came to and entered the United States on or about December 9, 1929. The plaintiff provided the defendant with money for his living expenses and passage to the United States upon his statement that he could not then obtain moneys for property which was his in Poland. After arrival a Jewish religious ceremony was performed, defendant cohabited once with plaintiff, obtained

an additional sum of money to buy furniture for the household, making the total of his receipts upwards of $1,500. Thereupon he informed the plaintiff, now that he was safely within the United States and could not be put out, he would not provide a home for her or live together with her as man and wife. He also disclosed that his statements made before marriage and representations of love and affection were not true.

Observation, experience and study indicate that there exists among many of the people, especially of the non-wealthy classes, of foreign lands the greatest desire to come to the United States, here to avail themselves of the civil, material, cultural and educational advantages, higher standards of living, and better working conditions, on the basis of equality of opportunity not open to them in the homes of their nativity. This desire transcends those thoughts, emotions and ties because of which human beings ordinarily remain in their native land, with family, relatives, kin and friends.

The desire exists in the immature and in adults of both sexes and is held also by those in declining years. Experience indicates that females as well as males of tender years, imbued with a desire to come to America, have left parents, close relatives and friends and every close human tie and have set out for the strange and distant land — America — because of the material things and ideal opportunities which they were taught, and through contacts with others and by experience had come to believe, would be theirs upon arrival. It is fair experience also with those familiar with the condition of immigration in the United States, that all sorts of efforts are made to evade the strict requirements in existence since the establishment of quotas under the Immigration Law. Such attempts are made by persons of seeming integrity as well as by those in whom that quality is wholly absent. Not to recognize these conditions, which are a matter of common public experience, is to ignore the recorded facts of State and National statistics and current history.

Man historically has not been a creature fixed to any one territory. There has been a well-defined movement of peoples, in large bands and smaller groups, as well by individuals alone or in companionable numbers from the earliest recorded habitable lands to other places all over the face of the earth. Anaxamander, the Greek philosopher, explained this on the theory that cosmos was an ever-moving limitless flood throwing up new forms and beings and drawing them in again into its immensity according to the law of destiny — whirling worlds, swaying tides, growing crops, wandering herds, puny man and his little systems erected probably for

a day against eternity, being but symbols of an unchanging force, the essence of all reality. (Early Greek Philosophy, J. Burnet [1908].)

Centuries after, Hegel, the German philosopher, saw the changing civilizations through the ages of a partial reflection of the grand idea of God, the Creator and " Upholder of all, an Infinite Power realizing its aim in the absolute rational design of the world." Nations rising and declining were to him but pawns in a majestic game, each with its mission to fulfill, with its heroes. as servants of their epochs carrying out that aspect of the idea then fated for realization. (E. S. Holdane and F. H. Simson, History of Philosophy [1892].)

Later, Werner Sombart, a German economist, held that imperialism or the taking over and colonization of territory was the result of an everlasting struggle among human societies over feeding places and the distribution of the world's natural resources. The hope for gain is the root of all imperialism.

" The military men told the people that they would get important material benefit from it " is the explanation by Polybius of the people's vote for the war in which " before the sword of Rome rich Carthage fell." (The Histories. I. B. Bury, Ancient Greek Historians [1909]; Translation in Loeb Series, W. R. Paton; Selections from Polybius, ed. Strachan-Davidson [Oxford 1888].)

The migratory Teutons were led on by the fair cities, the fertile fields, the treasures, the spoils of war of neighboring countries. When the gorgeous east was open to exploitation and discovery to the commerce of the world, in vain did moralists cry out against the fickle maidens and proud dames who gave so much of themselves and their treasure for the gauds, trinkets and luxuries of the Orient.

Even in conquest, as well as in exploration and colonization, there has been, of course, inspiration of the purest and noblest ideals, but in the main the thought has been conquest, rule, exploitation and gain — the spoils of empire or the profits of trade. The story of mankind cannot all be told in terms of commerce, profits, conquest and exploitation. Over-population, economic evils, failure in agricultural productivity, civil disturbances, tribal or sectional quarrels and religious persecutions, tyranny and oppression, were in many instances the cause. Nor was the movement always or in large measure by clan or family, with flocks, herds and household goods. More often the war band conquered, settled, domesticized, intermarried with the native population and became national by naturalization or habit and environment. The wealth, the gold, the precious and material things that spurred

on so many to hazard the dangers of voyage, savage warfare, extreme hardship, famine, disease, injury and death, were the main reasons of colonization and emigration. Such were the causes and reasons which led to the discovery and exploration of America. The advancement of religion and escape from religious persecution and civil oppression also played an important part. The wealth sought was poor, indeed, to what was found. Virgin forests, alluvial soil, fertile lands, precious mineral and metal deposits beyond the dream of those who sought gold and precious stones were ultimately the material reasons for colonization and immigration. The ultimate form of government, with its equality of opportunity, its freedom of conscience and of religious worship, and its advantages of trade, commerce, agriculture, manufacture, industry, education and culture was the powerful magnet which drew and held the immigrant. Nor was emigration to America as colonies or nation confined to men and families alone. Almost since the beginning of American history unmarried individuals of both sexes, of tender and of advanced years, have come here alone and unaccompanied by relatives. This is readily demonstrated. In early times the various companies and proprietors engaged in colonization, although they offered double the quantity of land to married men tendered to single men, also made grants of land to maids who came to America as colonists.

Additional authority to that given for the foregoing statements is found in " The Rise of American Civilization," Charles A. Beard and Mary R. Beard (2 vols.), McMillan Company, New York, 1928.

The United States census reports and the reports of the Commissioner-General of Immigration, United States Department of Labor, are particularly illuminating upon conditions of later years. The total foreign born population of the United States as shown by the census of 1920 amounted to 13,920,692, divided into males 7,528,322, females 6,184,432. Of that number the foreign born white population of voting age amounted to males, 6,928,452 and females 5,570,268. Of the foreign born white males in 1920 of voting age 2,138,237 were aliens; and of the women 2,226,672 were aliens. The foreign born population of the United States in 1900 as given in the table by Mulhall, of the probable statistics of the foreign born population in 1900 as compared with the census of 1890, shows the following:

Total, 1890 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,250,000
Total, 1900 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,160,000

The annual reports of the Commissioner-General of Immigration give the statistics of single immigrant men and women entering the United States in the ten-year period 1921 to June 30, 1930, as follows:

| Women: | | | Men: | | |
|---|---|---:|---|---|---:|
| | Under 16. | 356,078 | | Under 16..... | 365,851 |
| | 16–21.... | 343,153 | | 16–37........ | 1,123,070 |
| | 22–29.... | 261,946 | | 38 and over... | 16,433 |
| | 30–37.... | 69,696 | | | |
| | 38–44.... | 22,570 | | | |
| | 45 and over | 19,794 | | | |
| | | 1,073,237 | | | 1,505,354 |

(See, also, 1930 Census Report.)

Innumerable emigrants from other lands in advantageous positions of observation and experience have given expression to the thoughts, feelings, inspirations and desires which influence those of other lands to come to ours. Such statements are summed up by Carl Schurz, German-born emigrant to the United States, who, as orator, reformer, diplomatist, Senator, Secretary of the Interior, and publicist, rose to be one of America's immortal citizens. In the address delivered by him in Faneuil Hall, Boston, April 18, 1859, he stated: " I, born in a foreign land, pay my tribute to Americanism? Yes, for me the word Americanism, true Americanism, comprehends the noblest ideas which ever swelled a human heart with noble pride.

" It is one of the earliest recollections of my boyhood, that one summer night our whole village was stirred up by an uncommon occurrence. I say our village, for I was born not far from that beautiful spot where the Rhine rolls his green waters out of the wonderful gate of the Seven Mountains, and then meanders with majestic tranquillity through one of the most glorious valleys of the world. That night our neighbors were pressing around a few wagons covered with linen sheets and loaded with household utensils and boxes and trunks to their utmost capacity. One of our neighboring families was moving away across a great water, and it was said that they would never again return. And I saw silent tears trickling down weather-beaten cheeks, and the hands of rough peasants firmly pressing each other, and some of the men and women hardly able to speak when they nodded to one another a last farewell. At last the train started into motion, they gave three cheers for America, and then in the first gray dawn of the morning I saw them wending their way over the hill until they disappeared in the shadow of the forest. And I heard many a

man say how happy he would be if he could go with them to that great and free country, where a man could be himself.

" That was the first time that I heard of America, and my childish imagination took possession of a land covered partly with majestic trees, partly with flowery prairies, immeasurable to the eye, and intersected with large rivers and broad lakes — a land where everybody could do what he thought best, and where nobody need be poor, because everybody was free.

"And later, when I was old enough to read, and descriptions of this country and books on American history fell into my hands, the offspring of my imagination acquired the colors of reality, and I began to exercise my brain with the thought of what man might be and become when left perfectly free to himself. And still later, when ripening into manhood, I looked up from my school books into the stir and bustle of the world, and the trumpet tones of struggling humanity struck my ear and thrilled my heart, and I saw my nation shake her chains in order to burst them, and I heard a gigantic, universal shout for Liberty rising up to the skies; and at last, after having struggled manfully and drenched the earth of Fatherland with the blood of thousands of noble beings, I saw that nation crushed down again, not only by overwhelming armies, but by the dead weight of customs and institutions and notions and prejudices which past centuries had heaped upon them, and which a moment of enthusiasm, however sublime, could not destroy; then I consoled an almost despondent heart with the idea of a youthful people and of original institutions clearing the way for an untrammeled development of the ideal nature of man. Then I turned my eyes instinctively across the Atlantic Ocean, and America and Americanism, as I fancied them, appeared to me as the last depositories of the hopes of all true friends of humanity.

" I say all this, not as though I indulged in the presumptuous delusion that my personal feelings and experience would be of any interest to you, but in order to show you what America is to the thousands of thinking men in the old world, who, disappointed in their fondest hopes and depressed by the saddest experience, cling with their last remnant of confidence in human nature, to the last spot on earth where man is free to follow the road to attainable perfection, and where, unbiased by the disastrous influence of traditional notions, customs and institutions, he acts on his own responsibility."

Of similar import are statements by Stephen Girard, John Ericsson, Louis Agassiz, Theodore Thomas, Andrew Carnegie, James J. Hill, Augustus Saint-Gaudens, Jacob A. Riis, Edward

Bok, Rev. J. Havergall Sheppard, D. D., Robert Sewell, Thomas Addis Emmet, and innumerable others in a position to know by reason of experience. (See "Americans by Adoption," Joseph Husband, Atlantic Monthly Press, Inc., 1920; "Americanization of Edward Bok," Autobiography, Charles Scribner's Sons, 1930; "Journal of American Irish Historical Society, 1910, vol. 9;" Id., vol. 26, p. 205, 1927; "Annual Dinner Book of the Friendly Sons of St. Patrick, 1874," p. 21; "Memoirs of Thomas Addis Emmet and Robert Emmet," by Thomas Addis Emmet, M. D., LL.D., 1915.)

It is useless to expand upon what must from the mere statement of it be recognized as common historic knowledge, although volumes of quotations could be given to emphasize how widespread is such knowledge. The foregoing, however, will demonstrate the tremendous motive which would give rise to fraud and subterfuge for the purpose of obtaining that which is so priceless, but lately unattainable because of the Immigration Law quota restrictions. Great are the motives which lead individuals to concealment or false statement as to character and property, organic physical defects, existing disqualifying disease, antenuptial criminal activities and chastity, for the purpose of inducing others to enter into the marriage contract. No motive can be considered greater than that which has for its purpose entry into America by the evasion of a prohibitory quota law. No concealment or false statement to an American citizen matrimonially inclined, with the purpose of establishing a home and family in America, would be more destructive of the contract, status and purpose of marriage than that the alien resident in a foreign land there would marry the citizen for such purpose, with the contrary secret intention and the fraudulent design of using the citizen and the marriage to enter America by an evasion of the Immigration Law quota. The action of entering into the marriage and bringing the pseudo spouse to America certainly would be determined on the part of the citizen by the knowledge, false by reason of the misrepresentation, that the marital home and family was to be established in America. Such representation is material on the issue of intent. The citizen would not consent unless such home and family was to be established in America through the marital act. Any reasonably prudent person under the circumstances would be justified in relying upon such representation and would be deceived into the marriage which, had the truth been known, would be abhorrent to him.

Sound public policy and salutary principles of jurisprudence require that every reasonable safeguard be erected for the preser-

vation of the marital contract and status. There are certain essentials of the contract and status which have been the subject of judicial decisions from time out of memory. These essentials have been so frequently stated in so many varying shades of construction and interpretation, all for the very laudable purpose of maintaining the sanctity of the marriage status, that they are very difficult to collate and classify. Some of them, however, are fundamental for a valid marriage. It is with these alone that we are here concerned. Each of the two parties must be free to consent and to contract. Each party must consent and mutually contract. The contract must be public, that is, witnessed by one or more on behalf of the public for proof and record. The marriage contract arises into being from and is constituted of these collective essentials. The contract cannot be unless it has such essence. It has been held that before consummation any fraud which, if known to the innocent party, would result in no marriage is in general sufficient ground for annulment, but after consummation and the creation of a public status the marriage will be annulled only when the fraud goes to the essence of the contract. (*Di Lorenzo* v. *Di Lorenzo*, 174 N. Y. 467; *Svenson* v. *Svenson*, 178 id. 54; *Griffin* v. *Griffin*, 122 Misc. 837; affd., 209 App. Div. 883; *Schaeffer* v. *Schaeffer*, 160 id. 48; *Fisk* v. *Fisk*, 6 id. 432.) In the latter case (at p. 434) it is stated: " Without examining fully into all the cases on this subject, it may be sufficient to say that the rule is well settled that no fraud will avoid a marriage which does not go to the very essence of the contract, and which is not in its nature such a thing as either would prevent the party from entering into the marriage relation, or, having entered into it, would preclude performance of the duties which the law and custom imposes upon the husband or wife as a party to that contract. * * * Within that rule it has been held that fraudulent representations of one party as to birth, social position, fortune, good health and temperament do not vitiate the contract. * * *; and so also, it seems to be a well-established rule that no misconception of one party as to the character or fortune or temper of the other, however brought about, will support an allegation of fraud on which a dissolution of the marriage contract, when once executed, can be obtained in a court of justice. * * * If, when the relation is entered into, the party is competent to make that contract, is mentally competent to do the duties which the contract involves, and physically able to meet its obligations, nothing more can be required; and however the other party may be disappointed as to physical or mental characteristics which he or she expected would exist, such disappointment is no ground for setting aside

the contract, which the public good requires should be rendered indissoluble except for the gravest reasons."

Marriages, for the reasons stated, have been annulled for fraud upon the following grounds:

A false statement not relating to the capacity of its maker to enter into and discharge the marriage contract, but so material as to have determined the action of the party deceived. (*Svenson* v. *Svenson, supra; Di Lorenzo* v. *Di Lorenzo, supra,* revg. 71 App. Div. 509; *Domschke* v. *Domschke,* 138 id. 454; *Sobol* v. *Sobol,* 88 Misc. 277; *Bahrenberg* v. *Bahrenberg,* Id. 272; *Robert* v. *Robert,* 87 id. 629; *Keyes* v. *Keyes,* 6 id. 355; *Williams* v. *Williams,* 71 id. 590.)

Where the plaintiff was induced to marry the defendant by his representations that with her money and money of his own he would buy a hotel and go into business, and two days after the marriage she drew her money from the savings bank and gave it to the defendant upon his representation that it was paid on account of the purchase price of the hotel, and up to the date of the trial plaintiff had not seen the defendant nor learned of his whereabouts, the court held: " The conduct of the defendant leaves no doubt in my mind that he never had the slightest intention at any time of fulfilling his portion of this agreement, but rather that he intended to defraud the plaintiff of her money, and entered into the contract of marriage in order to further that end.   While it may be argued that his representations before marriage were statements of intention rather than statements of fact, nevertheless misstatements of intention which are material may, for the purpose of voiding contracts on the ground of fraud, be regarded as misstatements of fact." (*Robert* v. *Robert, supra.*)

Concealment prior to and at the time of the marriage of a chronic venereal disease of such a nature as to render the existence of the marriage relation between the two parties dangerous or loathsome is sufficient. (*Svenson* v. *Svenson, supra; Anonymous,* 21 Misc. 765; *Anonymous,* 34 id. 109.)

A false statement as to the existence of tuberculosis. (*Sobol* v. *Sobol, supra.*)

Defendant held himself out as a person of good character and concealed from plaintiff criminal activities in which he had been engaged, and annulment was granted. (*King* v. *Brewer,* 8 Misc. 587; *Keyes* v. *Keyes,* 6 id. 355; *Berus* v. *Berus,* 83 id. 624.)

Upon the false representation of the defendant, that plaintiff was the father of defendant's child. (*Di Lorenzo* v. *Di Lorenzo, supra.*)

A misrepresentation of prior chastity, while not necessarily a qualification for marriage, may be made such by insistence.

" Such a misrepresentation can afford ground for the annulment of a marriage for fraud because, as a matter of law, it can be material upon the question of the consent, which is essential to the contract of marriage. To reach any other conclusion is to say in effect that the fact that the woman, otherwise acceptable, is unchaste cannot be sufficient motive for the man of average intelligence and prudence to refuse consent to marriage." (*Domschke* v. *Domschke, suprà.*)

Where the plaintiff went through the marriage ceremony not understanding it, while in a state of intoxication procured by the defendant, annulment was granted. (*Sloane* v. *Kane*, 10 How. Pr. 66.)

Concealment that the defendant was subject to epileptic fits was held ground for annulment. (*People ex rel. Plumley* v. *Higgins*, 109 Misc. 328; *Lapides* v. *Lapides*, 224 App. Div. 257.)

False representations by defendant, that he was of good personal habits and not addicted to the use of any drugs, narcotics or stimulants, upon which the plaintiff relied, is sufficient ground. (*O'Connell* v. *O'Connell*, 201 App. Div. 238.)

False representation by the defendant to plaintiff and her family that he was an American citizen, upon which plaintiff relied and otherwise would not have married, was held sufficient. (*Truiano* v. *Truiano*, 121 Misc. 635.)

Where the defendant induced the plaintiff to enter into a civil marriage ceremony upon the promise fraudulently made that he would later enter into a religious ceremony, but never intended to do so, and the plaintiff would not have entered into any marriage with the defendant unless a religious ceremony was performed, annulment was granted. (*Aufiero* v. *Aufiero*, 222 App. Div. 479.) The court there stated: " The facts thus proven were sufficient to entitle her [plaintiff] to maintain this action *even though there may have been cohabitation before the discovery of the fraud.*" (Italics are writer's.) (Civ. Prac. Act, § 1139; *Jacobson* v. *Jacobson*, 207 App. Div. 238, 239; *Watkins* v. *Watkins*, 197 id. 489; *Rutstein* v. *Rutstein*, 221 id. 70.)

On the other hand, for the reasons stated, annulment has been refused where the fraud asserted was upon the following grounds:

A marriage induced by false representations not of such a nature as would be calculated to deceive a reasonably prudent person in like circumstances. (*Di Lorenzo* v. *Di Lorenzo, supra; Bahrenberg* v. *Bahrenberg, supra; Hides* v. *Hides*, 65 How. Pr. 17.)

A misrepresentation innocently made without knowledge of the

true facts and with no intent to deceive. (*Scott* v. *Shufeldt*, 5 Paige, 43.)

A wife *married three years* was refused an annulment, the *ground of fraud being that three years before the marriage* her husband, a physician, told her he was well, when *in the intervening six years his health was good*, but at the end of the period his health declined and he was threatened with tuberculosis, for which malady he had previously received medical treatment under which he improved and subsequently enjoyed good health. (*Gumbiner* v. *Gumbiner*, 72 Misc. 211.)

Annulment was denied upon the ground of fraud, where the testimony being solely by the plaintiff, was that the defendant who, before marriage, protested undying love, after consummation thereof told her he did not love her and never intended to and insisted that she divorce him. (*Schaeffer* v. *Schaeffer*, *supra*, later referred to and distinguished.)

In general, false representations as to character and as to the extent and value of wordly possessions are not sufficient grounds for declaring the marriage void. (*Klein* v. *Wolfsohn*, 1 Abb. N. C. 134.)

The concealment by the wife from her husband that she had a swollen tongue and inflammation of the bladder is not sufficient grounds for annulment. (*Riley* v. *Riley*, 73 Hun, 575.)

Concealment from the other party of incontinence prior to marriage is in and of itself not sufficient. (*Glean* v. *Glean*, 70 App. Div. 576; *Schrady* v. *Logan*, 17 Misc. 329, but see *Domschke* v. *Domschke*, *supra*.)

To understand how fundamental to the marriage contract are the mentioned essentials consideration must be given to the purpose of marriage as a public institution. Cohabitation, union and children are not alone such purpose. What is regarded under our law as illicit relationship, whether temporary or permanent, could just as readily accomplish all these. The essential purpose is the establishment of the conventional home and family, with children, the unit out of which arises and upon which society is established. That society to which reference is made, while in a broad sense it may be human kind in general, has to do especially with the welfare of our citizens and residents under the sovereign law of our State and Nation. (*Cunningham* v. *Cunningham*, 206 N. Y. 341, revg. 145 App. Div. 919, revg. 70 Misc. 129.)

In *Simmons* v. *Simmons* (208 App. Div. 195) it was held that the State courts have no jurisdiction to annul a marriage contracted in a foreign country valid by its law between two actual *bona fide* residents and citizens or subjects of such country. The rule stated in *Cunningham* v. *Cunningham* is thereby emphasized.

This must be recognized for the reason that, no matter with what freedom of action and desire two parties, one of whom was an American citizen, entered into a contract of polygamous marriage in a country sanctioning the same as valid, it would here be held void. (*Earle* v. *Earle*, 141 App. Div. 611; *Moore* v. *Hegeman*, 92 N. Y. 521, affg. 27 Hun, 68; *Thorp* v. *Thorp*, 90 N. Y. 602, revg. 47 Sup. Ct. 80; *Van Voorhis* v. *Brinthall*, 86 N. Y. 18, revg. 23 Hun, 260, but see also *Simmons* v. *Simmons*, *supra*.) The statutory provision that a marriage is void if contracted by a person whose husband or wife by a former marriage is living, is declarative of public policy. (*Ashdown* v. *Ashdown*, 178 N. Y. Supp. 565.) If the purpose of marriage is frustrated by a fraudulent intent and design existing before marriage, and later accomplished by the marriage, then assuredly such fraud goes to and destroys the very essence of the marriage. The fraudulent intent of the defendant existing prior to the marriage not to consummate the marriage with the plaintiff has been held to be ground for annulment. (*Merizio* v. *Merizio*, 242 N. Y. 74; *Rutstein* v. *Rutstein*, 221 App. Div. 70; *Miller* v. *Miller*, 132 Misc. 121.)

Public marital status, it has rightly been held, follows the consummation of the marriage contract. With the preservation of this status the public and the courts are most concerned. (*Svenson* v. *Svenson*, 178 N. Y. 54.)

Cohabitation alone, or even the birth of a child, does not render a fraudulent contract of marriage valid, although the courts vigilantly scrutinize the pleading and supporting proof seeking such declaratory relief, and are extremely cautious in such decisions. (*Aufiero* v. *Aufiero*, 222 App. Div. 479.)

Where there is fraud going to the essence of the marriage contract, it will not be validated by cohabitation, unless at the time the innocent party knows of the fraud, when such intercourse is said to be with marital intent and the contract is then regarded as affirmed or ratified and therewith consummated. There can be no consummation and marital status unless and until the innocent party knows of the fraud, and the parties thereafter have intercourse, or cohabit with marital intent.

A party to a void or voidable marriage, however, is not entitled as a matter of absolute right to a decree of nullity. The allowance of such a decree rests to some extent in the discretion of the court and relief may be denied on equitable grounds. (*Berry* v. *Berry*, 130 App. Div. 53; *Pettit* v. *Pettit*, 105 id. 312; *Taylor* v. *Taylor*, 63 id. 231; affd., 173 N. Y. 266.) In such cases as do not strictly come within the general rules of law, recognized by the courts from antiquity, the decision by the court is given upon the facts precisely

applicable thereto, and is not rendered exclusively as matter of law. (*Brown* v. *Brown*, 153 App. Div. 645.)

It would appear that the cases do not go further in upholding marital status. The case at bar, then, presents a question of fact.

Quotas are established by the national American law for the protection and advancement of American society. Courts may disagree with the wisdom thereof, but should accept and uphold the law and its known policy. How great is the desire to enter America, how irresistible the motive to evade the prohibitory quota restriction, has been pointed out. The defendant had this desire and motive. He concocted his fraudulent scheme of marrying defendant, an American citizen, to evade the Immigration Law quota. In accomplishing his scheme he represented to plaintiff that he loved her, had money and property, would marry her, and establish a home and live with her as husband and wife in the United States. She believed in him and relied upon this statement. She would not have entered into any marriage with him if she had known that his statements were false. She entered into a civil marriage with him in Cuba. Cautiously she refrained from a Jewish ceremonial marriage until later. She returned to the United States, applied for and obtained a preferential permit from the State Department for the entry of her alien husband. She supplied him with money. He entered the land of golden dreams. The ceremonial religious marriage was performed. He obtained more money from her. They had intercourse once. Then his fraudulent scheme accomplished he made it known. " We are married. I never loved you. I never intended to live with you. I married you to get into the United States. I am in the United States and cannot be put out. I deceived you. I do not love you. I will not live with you. What are you going to do about it? " Where then is the marriage contract, the status, the home, the family, upon which as a foundation society rests? I am convinced that this is not consummation and the creation of a sacred marital status. I am of the very firm and conscientious opinion expressed. I am in full accord, however, with the law set forth in the statute and declared in the decisions of the courts: Marriage in so far as the civil law is concerned is a civil contract, " * * * but it is not thereby made synonymous with the word contract employed in the common law or statutes. * * * It cannot be dissolved by the parties when consummated nor released with or without consideration. The relation is always regulated by government. It is more than a contract. It requires certain acts of the parties to constitute marriage, independent of and beyond the contract. *It partakes more of the character of an institu-*

*tion regulated and controlled by public authority, upon principles of public policy* (Italics mine), for the benefit of the community. Kent says: ' It has its foundation in nature, and is the only lawful relation by which Providence has permitted the continuance of the human race.' (2 Kent Com. 75.) Judge STORY says: ' But it appears to me to be something more than a mere contract. It is rather to be deemed an institution of society, founded upon the consent and contract of the parties.' (Story on Con. of Laws, § 108, note.) He quotes, approvingly, a distinguished Scottish judge: ' That marriage is *sui generis* and differing in some respect from all other contracts, so that the rules of law which are applicable in expounding and enforcing other contracts may not apply to this.' (Sec. 109.) In *Ditson* v. *Ditson* (4 R. I. 87, 101) the court say: ' In strictness, though formed by contract, it signifies the *relation* of husband and wife, deriving both its rights and duties from a source higher than any contract which they can make.' " (*Wade* v. *Kalbfleisch*, 58 N. Y. 282, 284, 285.)

For many years in this State and at common law marriage might be entered into by persons respectively of the ages of fourteen and twelve. The legal age of consent in this State is now eighteen. This indicates the public policy in respect of marriage age and takes note of the arrival of maturity for that purpose long prior to that which is required for the valid execution of an ordinary contract.

The cases of *Schaeffer* v. *Schaeffer* (*supra*) and *Griffin* v. *Griffin* (*supra*) have been cited as authorities but are readily distinguishable from the case here. In *Schaeffer* v. *Schaeffer* (*supra*) the evidence showed an intent on the part of both of the parties to enter into the marriage contract and there was a consummation with marital intent. Thereafter there was an apparent change of feeling on the part of the defendant, who informed the plaintiff some days after the consummation that he did not love her and never intended to love her and insisted that she get a divorce from him. In *Griffin* v. *Griffin* (*supra*) the parties lived together in marital relationship for seventeen years and two children were born to them, who, at the time the action was commenced, were respectively fifteen and six years of age, the plaintiff owned property in which his wife had a dower interest and even if the fraud were sufficient to annul the marriage contract, if not consummated, a decree of annulment under the circumstances would be inequitable.

In *Truiano* v. *Truiano* (*supra*) plaintiff, an American citizen, by occupation a school teacher, married the defendant upon his representation to her that he was an American citizen. The Education Law, section 550, provided that no person shall be employed or authorized to teach in the public schools who is not a citizen. A Federal statute in force at the time of the marriage

provided that an American woman marrying a foreigner shall take the nationality of her husband and that the wife could not resume her citizenship while the marriage relation continued. ( *United States* v. *Cohen*, 179 Fed. 834.) After the parties separated, but before the action for annulment, Federal statutes were enacted relieving women married to aliens from lost citizenship, and a woman who had lost her citizenship might in the manner provided become repatriated by naturalization. The court held that consummation did not bar recovery and subsequent enactments did not relieve the defendant of the fraud and granted the annulment to the plaintiff.

It has been repeatedly held that it is sufficient if the fraud be such that, had it not been practiced, the marriage contract would not have been made or the transaction of marriage completed. (*Di Lorenzo* v. *Di Lorenzo, supra,* and cases therein and others above cited.)

Where the representation at the time of entering into the marriage contract is that the offending party is entering into the marriage to carry out the expressed purpose of establishing a marital domicile, a home in the United States, and there performing all the marital obligations and establishing a family, but on the contrary, the intent and design is not to enter upon the status, but to use the form of marriage and cohabitation to accomplish the fraudulent scheme of evading the United States Immigration Law quota, then not only is the representation material to and destructive of the essential marriage consent, but the purpose and aim of the marriage is also defeated, the sacred institution rendered profane and the public policy of quota for the protection of American society flouted and evaded.

I have arrived at this opinion after most careful consideration herein and reconsideration of that which was previously studied and weighed with painstaking care for many days. My conclusion is that the facts shown clearly constitute fraud which is material to and destructive of the essential consent necessary to validity of the contract. The parties by their expressed intent made the facts represented material to the giving of the consent. (*Di Lorenzo* v. *Di Lorenzo, supra.*) Section 1143 of the Civil Practice Act and the cases of *Steimer* v. *Steimer* (37 Misc. 26) and *Chambers* v. *Chambers* (32 N. Y. Supp. 876) are cited as authority for the asserted proposition that the evidence upon which the plaintiff seeks an annulment consists solely of confessions or declarations alleged to have been made by the defendant. In *Steimer* v. *Steimer (supra)* it appears that " The only witnesses examined or proofs offered

before the referee were the plaintiff and the defendant. Of this proceeding the mother of the defendant had no knowledge until some time after the entry of the decree. The sole ground for the annulment of this marriage between a man of forty-five, a widower, with two children, twenty-one and seventeen years old, and a girl of seventeen, with whom he testifies that he had intercourse many times before marriage, was that he was deceived by her into believing that she was a virtuous girl, and that the child of which she was pregnant was his, and that she confessed to him about two weeks after the birth of the child that he was not its father. The plaintiff testified to her confession, made to him by the defendant, and then called the defendant, who admitted the truth of such confession." And in *Chambers* v. *Chambers* (*supra*) it appears that the only proof of the existence of the previous marriage which constituted the ground for which an annulment of the second marriage was sought, consisted of the declaration of the defendant testified to by the plaintiff, and the marriage register purporting to contain an entry of the marriage in question. The register was incompetent proof, so that the only proof of the previous marriage was the declaration of the defendant testified to by the plaintiff. These cases do not appear to me to cast upon the plaintiff any greater burden than to sustain the material allegations of the complaint by clear, satisfactory and convincing evidence, which, according to the circumstances of the case, may be either direct or inferential. There is in this case, I am convinced, sufficient evidence within the rule stated. The American citizen under the form of the most sacred and solemn relationship was not only led by the deceit into the marriage but also innocently to participate in the fraudulent circumvention of American national law and public policy. In my opinion, upon ascertaining the facts, the innocent party who had matrimonial intent and purpose, and gave her consent through such fraud but found, by reason of the deceit practiced, that there was no marital relation, home, family or status, on which as upon a foundation rests American society, and that she had been used as an unwitting tool for the violation and circumvention of the American public policy of quota restriction, is entitled to an annulment of the marriage contract. Submit decision and decree accordingly on notice.