GENEVIEVE LICATO, an Infant over the Age of Fourteen Years, by Her Guardian ad Litem, LORETTA M. PELELLA, Plaintiff, *v.* JOSEPH LICATO, Defendant.

Supreme Court, Dutchess County, August 30, 1937.

*Flannery & Supple* [*John Palisi* of counsel], for the plaintiff.

*Vincent Di Gennaro*, for the defendant.

MORSCHAUSER, Official Referee. By an order of the Supreme Court dated the 26th day of July, 1937, the issues in this action were referred to me as official referee to hear, try and determine the said issues, which order directed that an interlocutory judgment may be taken, of course, with the same force and effect as if the issues were tried at a regular term of this court, and ordering that judgment may be taken, of course, upon the report of the official referee and his

findings of fact and conclusions of law with his decision thereon, pursuant to section 1174 of the Civil Practice Act.

The plaintiff herein alleges in her complaint that she married the defendant at Beacon, N. Y., on the 20th day of December, 1936, when she was nineteen years of age; that she lived with him until March 5, 1937; that the defendant represented he was healthy and well and had no disease and was able to carry on his marriage relations; that there is no issue of the marriage; that she left him on March 5, 1937, and thereafter she never lived or cohabited with him nor continued the marriage relationship since her discovery of his physical venereal condition, unknown to her at the time of said marriage, and not discovered by her until she left him. He was afflicted with a chronic contagious and hereditary venereal disease when she married him, and until she discovered his physical venereal condition she had no knowledge thereof; that he inoculated her with this venereal disease; that she has suffered much pain from such condition and has not been fully cured thereof so far as known to her, nor has he recovered; that he committed a fraud upon her in not revealing to her his physical venereal condition and by representations before the marriage and by his silence cheated and defrauded her; that she would not have married the defendant had she known of his physical condition, well known to him and unknown to her; that she also claims that this false representation as to his healthy physical condition was before the marriage and also that when he applied for the marriage license in plaintiff's presence he represented he was free from any venereal or any other contagious disease; that she asks for an annulment of this marriage for the frauds practiced on her. The defendant appeared in said action but did not answer. The proof shows the truth of the allegations of the complaint.

The plaintiff was an innocent and unsuspecting girl at the time of her marriage; she was well brought up, attended her church, and was respected in her community. Her life was clean and pure. Defendant was afflicted with said venereal disease prior to the marriage and he knew it at the time of the marriage. He never informed her of this venereal disease until she had left him when he revealed his venereal condition to her. I find that the plaintiff has proved all the allegations of her complaint and that she has established her case by strong and convincing proof and is, therefore, entitled to the relief asked for in her complaint herein, as amended on the trial. There is no issue of the marriage, no debts incurred or real estate involved. The title, by order of the court, has been corrected before the trial. It is permissible to do so. The defendant consented to it. (See *Spooner* v. *Delaware, L. & W. R. R. Co.*,

115 N. Y. 22; *Perkins* v. *Stimmel*, 114 id. 359, 363, 365; *Conlin* v. *Conlin*, 214 App. Div. 735; Civ. Prac. Act, § 105; *Weltick* v. *Tufano*, 233 App. Div. 875.)

Actions of this kind are not new. The courts have granted relief to plaintiffs in similar actions where false representations and fraud by silence have imposed on an innocent victim when there was a duty to speak. In *Sobol* v. *Sobol* (88 Misc. 277), concealment of defendant's epilepsy. (See *Coppo* v. *Coppo*, 163 Misc. 249, and cases cited.) *Svenson* v. *Svenson* (178 N. Y. 54) is much similar to the action herein. MARTIN, J. (at p. 57), writing for the Court of Appeals, wrote:

" But it is certain at least that at the time of the marriage the defendant was incapable of meeting the obligations and performing the functions of the marital relation, and was morally and physically unfit to become or continue to be the husband of a pure and innocent girl.. When he concealed that condition from her and still induced her to marry him in ignorance thereof, he was guilty of a base and unmitigated fraud as to a matter essential to the relation into which they contracted to enter. Obviously the principle that refuses relief in cases of ordinary ill-health after the marriage contract has been actually consummated has no application to a case like this, where there has been no consummation and the disease is one involving disgrace in its contraction and presence, contagion in marital association, and includes danger of transmission and heredity that even science cannot fathom or certainly define. The suppression of the presence of a disease including such dire and disastrous possibilities, directly affecting the marital relation, constitutes a fraud which clearly entitles the innocent party to a decree annulling the marriage contract, particularly when it has not been consummated.

" Marriage begins by contract and results in a status. If, before children are begotten, before debts are created, real estate involved, and the community have long recognized the relation, the injured party seeks relief from fraud, error or duress, it seems clear that no consideration of public policy will prevent a court from annulling a marriage where the relation has not fully ripened into the complications of a public *status*. In such case the marriage is but little more than a contract; and, in view of the serious consequences to follow, the degree of fraud which vitiates a contract should be sufficient. (Nelson on Marriage and Divorce, § 600.) ' Where there has been no consummation, any fraud which would be sufficient to annul a contract should in reason be sufficient to annul a marriage ceremony. No satisfactory reason of the law will justify the courts in declaring valid such a contract marriage when tainted with fraud or duress

where the only effect will be the punishment of the innocent and the confiscation of his or her property by the deception. If the marriage is declared valid it will exist in name only, preventing both parties from marrying again and bringing the marriage relation into disrepute. Every reason for relief from fraud is applicable here, where a denial of relief is fraught with evil consequences much greater than those flowing from ordinary contracts.' (Id. 602.) ' Whatever of fraud, of error, or duress will vitiate any other contract, should ordinarily be received as sufficient to vitiate the mere marriage contract, whether executory or executed, viewed as a thing separate from the consummation which follows.' (1 Bishop on Marriages and Divorce, § 166 *et seq.*)

" This principle was very clearly and concisely stated by WOOD-WARD, J., in *di Lorenzo* v. *di Lorenzo* (71 App. Div. 509, 519) as follows: ' When, however, the fraud is discovered before the marriage is consummated, and the innocent party refuses to cohabit, the marriage is so inchoate and incomplete that the *status* of the parties is similar to that of parties to an executory contract, and may be annulled without violating any consideration of public policy.'

" This court, in *Kujek* v. *Goldman* (150 N. Y. 176, 179), in discussing the question of the marital relation, made this remark: ' It is difficult to see why a fraud, which, if practiced with reference to a contract relating to property merely, would support an action, should not be given the same effect when it involves a contract affecting not only property rights, but also the most sacred relation of life.' This principle seems quite applicable where the marriage rests in contract alone, and has not ripened into ' the complications of a public *status.*' Again in *di Lorenzo* v. *di Lorenzo* (174 N. Y. 467, 472), which was an action to annul a marriage contract upon the ground of fraud, it was said: ' The free and full consent, which is of the essence of all ordinary contracts, is expressly made by the statute necessary to the validity of the marriage contract. The minds of the parties must meet in one intention. It is a general rule that every misrepresentation of a material fact, made with the intention to induce another to enter into an agreement and without which he would not have done so, justifies the court in vacating the agreement. It is obvious that no one would obligate himself by a contract if he knew that a material representation, entering into the reason for his consent, was untrue. There is no valid reason for excepting the marriage contract from the general rule. In this case the representation of the defendant was as to a fact, except for the truth of which the necessary consent of the plaintiff would not have been obtained to the marriage. * * * The minds of the parties did not meet upon a common basis of operation. **The**

artifice was such as to deceive a reasonably prudent person and to appeal to his sense of honor and of duty. The plaintiff had a right to rely upon the defendant's statement of a fact, the truth of which was known to her and unknown to him, and he was under no obligation to verify a statement, to the truth of which she had pledged herself. It was a gross fraud, and, upon reason, as upon authority, I think it afforded a sufficient ground for a decree annulling the marriage.' In that case the representation was that the defendant had been delivered of a child of which the plaintiff was the father. While it may well be said that the cases to which we have previously referred are not precisely analogous to the case at bar, yet the principles laid down by the text writers and in those cases establish a general doctrine more or less applicable to the case under consideration.

" There is, however, another line of cases more closely resembling the case at bar, which will now be considered. *Smith* v. *Smith* (171 Mass. 404, 408) was an action to procure a sentence of nullity of marriage. In that case, it was held that it was within the power of the Superior Court to enter a decree declaring a marriage void where it appeared that the libelant, after the ceremony and before the consummation of the marriage, on learning that the respondent was afflicted with a venereal disease, refused to live with him. The court in discussing that case said: ' The case at bar rests solely upon fraud in regard to the bodily condition of the libelee. As we have already seen, the previous unchastity of the libelee is not enough to entitle the libelant to relief. Indeed, we are not quite certain from the report that the libelee might not have been constitutionally affected with the disease from his birth. But, on the findings of the judge, his concealed disease was such as would leave with him no foundation on which the marriage relation could properly rest. It had advanced to such a stage as probably to be incurable. The libelant could not live with him as his wife without making herself a victim for life, and giving to her offspring, if she had any, an inheritance of disease and suffering. While this case lacks the element of introducing a bastard child into the husband's family, which existed in *Reynolds* v. *Reynolds* (3 Allen, 605), it has the element of a loathsome incurable contagious disease to be communicated to the wife, which the other had not. Few if any would be bold enough to say that it was the duty of the libelant, on discovery of the fraud before the consummation of the marriage, to give herself up as a sacrifice, and to become a party to the transmission of such a disease to her posterity.' This case was followed by the case of *Vondal* v. *Vondal* (175 Mass. 383) where it was held

that the concealed existence of a venereal disease in one of the parties to a marriage which has been consummated is not a sufficient ground for the annulment of the marriage, but that case turned upon the fact of a presumed consummation of the marriage by cohabitation within four months after its celebration.

" In an anonymous case (21 Misc. Rep. 765) the facts were in all essential respects identical with the facts in this case, and it was held by the referee before whom it was tried that the marriage should be annulled upon the ground that the presence of such a disease was a fraud upon the plaintiff; that the contract having been made in reliance upon the representation of the defendant that he was in good health, an annulment of the marriage was recommended. In that action the learned referee refers to an unreported case, decided in July, 1897, by Mr. Justice TRUAX, wherein a marriage was dissolved for fraud in the suppression by the defendant of the fact that he was affected at the time of the marriage with syphilis which he gave to his wife and which was transmitted to a child born of the marriage who afterwards died. In *Meyer* v. *Meyer* (49 How. Pr. 311) a similar doctrine was held. *Ryder* v. *Ryder* (66 Vt. 158) is to the effect that if the wife, at the time of contracting the marriage relation, conceals from her husband the fact that she has chronic and incurable syphilis, it would amount to a fraud for which the marriage may be annulled under the statute which provides, ' the marriage contract may be annulled when, at the time of the marriage, either party * * * was * * * physically incapable of entering into the marriage state, or when the consent of either party was obtained by force or fraud.' Without further discussion of this question, we are clearly of the opinion that the plaintiff was entitled to the relief sought in this action, and this conclusion is justified by the principle of these authorities. It is evident that the marriage not having been consummated, the usual considerations of public policy which apply to a case where the relation has by consummation of the marriage ripened into a public *status* do not exist here. There was between these parties little more than a contract to marry, and we are aware of no principle of public policy which would be subverted by annulling this marriage, or which requires us to compel the plaintiff to consummate the marriage and give herself up as a sacrifice to the possibilities involved in such a course."

There are various kinds of frauds for which the courts have allowed an annulment of marriage. See *Schonfeld* v. *Schonfeld* (260 N. Y. 477) in which the Court of Appeals held: " 3. Fraud is of no avail unless it appears that consent to the marriage was

induced thereby, nor is every such fraud an adequate basis for annulment. On the other hand, the fraud need not necessarily concern the rights and duties connected with cohabitation and consortium. Any fraud is adequate which is of such a nature as to deceive an ordinarily prudent person where, had it not been practiced, the party deceived would not have consented to the marriage. (*di Lorenzo* v. *di Lorenzo*, 174 N. Y. 467, followed.) "

Cohabitation prior to the discovery of the fraud by the injured party is not a basis for denying the plaintiff her relief under the statute. It is cohabitation with full knowledge of the fraud which renders the prohibition of the statute (Civ. Prac. Act, § 1139) effective. (See *Aufiero* v. *Aufiero*, 222 App. Div. 479, in which it was held that where the plaintiff immediately left the defendant upon her discovery of his fraud, this was sufficient to entitle the plaintiff to maintain her action under section 1139 of the Civil Practice Act, although there had been cohabitation before the discovery of the fraud.)

In *Jacobson* v. *Jacobson* (207 App. Div. 238) Presiding Justice KELLY enunciates the rule, following the opinion of Judge MARTIN in *Svenson* v. *Svenson* (178 N. Y. 54), continuing as follows (at p. 240): " Of course in the case at bar the marriage had been consummated — more than that, the marriage took place on December 25, 1913, and there is a child of the marriage seven years of age at the date of the commencement of the action which was not until June 12, 1922. * * * There does not appear to be any dispute about the defendant's unfortunate condition at the date of the trial, and the trial judge finds that plaintiff did not discover the facts until 1920, since which time she has not cohabited with him. She could, therefore, maintain an action to annul the marriage upon the ground of fraudulent concealment of his condition known to him at the time."

In *Rubman* v. *Rubman* (140 Misc. 658) the defendant, an alien, married the plaintiff, an American citizen, as part of a scheme to accomplish the entry of the defendant into the United States. The marriage was consummated, but shortly after it the defendant informed plaintiff that he never loved her and never intended to live with her, and had married her only to get into the United States, whereupon plaintiff left defendant, sued for and obtained an annulment of the marriage. In this case the court states: " Where there is fraud going to the essence of the marriage contract, it will not be validated by cohabitation, unless at the time the innocent party knows of the fraud, when such intercourse is said to be with marital intent and the contract is then regarded as affirmed or

ratified and therewith consummated. There can be no consummation and marital status unless and until the innocent party knows of the fraud, and the parties thereafter have intercourse, or cohabit with marital intent."

In a very recent case (*Antonelli* v. *Antonelli*, N. Y. L. J. Feb. 16, 1937, p. 801) Mr. Justice ROSENMAN found: "Judgment for plaintiff. Although I believe there was consummation of the marriage, there was none after the discovery by the plaintiff that no religious ceremony was going to be entered into by the defendant."

The leading and most illuminative case upon obligations of the parties to a marriage contract is found in *Mirizio* v. *Mirizio* (242 N. Y. 74), in which Chief Judge HISCOCK (at p. 81) says: " But the refusal of husband or wife without any adequate excuse to have ordinary marriage relations with the other party to the contract strikes at the basic obligations springing from the marriage contract when viewed from the standpoint of the State and of society at large. However much this relationship may be debased at times it nevertheless is the foundation upon which must rest the perpetuation of society and civilization. If it is not to be maintained we have the alternatives either of no children or of illegitimate children, and the State abhors either result. The mere fact that the law provides that physical incapacity for sexual relationship shall be grounds for annulling a marriage is of itself a sufficient indication of the public policy that such relationship shall exist with the result and for the purpose of begetting offspring."

The law implies reasonable, proper marriage relation in every contract of marriage. Absolute and continual refusal to have ordinary marriage relations with the other party after marriage, without reasonable, proper, justifiable or adequate excuse therefor, is enough to invalidate the marriage.

Ratification or waiver may be established in many other ways than by cohabitation after the discovery of the fraud. It would seem that oral forgiveness after full confession would be sufficient, and particularly so if followed by cohabitation. It has been held that entering into a separation agreement, and thus recognizing the validity of the marriage, constitutes a waiver of the original fraud and then an annulment cannot thereafter be granted. (*Pellerin* v. *Pellerin*, 123 Misc. 552; *Butler* v. *Butler*, 204 App. Div. 602.)

As was held in the *Svenson* case (*supra*), I believe the plaintiff herein is entitled to the relief she asked for in her complaint in this action, and that the marriage herein between the plaintiff and defendant should be annulled and that the plaintiff have the relief asked for. The waiving of the privilege by the defendant herein

and his failure to answer or the conduct of the defendant or his attorney should not be believed or construed that there is any connivance or collusion by the parties or their respective attorneys in this case. The defendant realized the enormity of the wrong done to the plaintiff herein and did and has done the only decent thing that any fair and honest individual should do under the circumstances regardless of the record that will stand recorded against him.

Findings may be presented in accordance with the foregoing facts found herein and the conclusions of law. Plaintiff is entitled to an interlocutory decree herein and the same should be granted and entered herein.